IN THE UNITED STATES DISTRICT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

MARYLAND CASUALTY COMPANY,

         Plaintiff,

 vs.                  CASE # 1:13-cv-3056-TWT

SALON AVENUE SUITE 2;
SALON AVENUE SUITES, INC.;
MARK ALLEN STORCH; JULIETTE
COLON; ELIZABETH B. BARRON;
KARI BENEDICT; HEATHER BOWEN;
NANCY CLARK; DONNA McRAE;
KATHERINE MILLER; MARY ROE and
JANE DOE,

         Defendants.

30(b)(6) and Individual DEPOSITION of ALLEN MARK STORCH

May 14, 2014 - 10:00 a.m.

Swift Currie McGhee & Hiers, LLP

The Peachtree, Suite 300

1355 Peachtree Street, NE

Atlanta, GA  30309

Lucy C. Rateau, CCR, RPR

```
1                    INDEX OF EXHIBITS

2   Exhibit              Description              Page

3
            #1      Plaintiff's Notice of Deposition    11
4
                    Pursuant to 30(b)(6) to Defendant
5
                    Salon Avenue Suites
6
            #2      Photocopy of a business card for    17
7
                    Allen Storch - Salon Avenue
8
                    Suites
9
            #3      Incident/Investigation Report,      32
10
                    Cobb County Police, 7/27/12
11
            #4      Salon Avenue Suites Standard        36
12
                    Service Agreement between Salon
13
                    Avenue Suites and    Mary Roe
14
            #5      Incident/Investigation Report,      40
15
                    Cobb County Police, 8/10/12
16
            #6      Correspondence from Zurich          46
17
            #7      General Bill of Indictment          59
18

19

20              INDEX TO EXAMINATIONS              PAGE
21
22  By Mr. Meeks                                      7

23

24

25
```

```
 1     APPEARANCES OF COUNSEL:

 2     On behalf of the Plaintiff:

 3             CHRISTOPHER C. MEEKS, ESQ.

 4             SETH FRIEDMAN, ESQ.

 5             Weissman Nowack Curry & Wilco

 6             One Alliance Center, 4th Floor

 7             3500 Lenox Road

 8             Atlanta, GA  30326

 9             404.926.4500

10             sethf@wncwlaw.com

11

12     On behalf of the Defendants Salon Avenue 2; Salon

13     Avenue Suites, Inc.; Allen Mark Storch; Juliette

14     Colon:

15             J. BLAIR CRAIG, ESQ.

16             Wood & Craig, LLC

17             197 14th Street, NW

18             Suite 200

19             Atlanta, GA  30318

20             404.888.9962

21             blair@woodcraig.com

22      - and -

23             DANIEL J. KINGSLEY, ESQ.

24             Swift Currie McGhee & Hiers, LLP

25             The Peachtree, Suite 300
```

```
 1              1355 Peachtree Street, NE

 2              Atlanta, GA  303090

 3              404.888.6172

 4              dan.kingsley@swiftcurrie.com

 5

 6     On behalf of the Defendants Elizabeth B. Barron, Kari

 7     Benedict, Heather Bowen, Nancy Clark, Donna McRae and

 8     Katherine Miller:

 9              TODD YATES, ESQ.

10              Kaufman Law

11              100 Galleria Parkway, SE

12              Suite 1100

13              Atlanta, GA  30339

14              404.355.4000

15              tmy@kaufmanlaw.net

16

17     On behalf of the Defendant Mary Roe:

18              RICHARD G. FARNSWORTH, ESQ.

19              Farnsworth Law

20              5064 Roswell Road

21              Suite A-100

22              Sandy Springs, GA  30342

23              404.525.8500

24              Richard@FarnsworthLawATL.com

25
```

```
 1     On behalf of the Defendant Jane Doe:

 2              E. BRIAN WATKINS, ESQ.

 3              E. Brian Watkins, PC

 4              3350 Peachtree Road, Suite 1225

 5              Atlanta, GA  30326

 6

 7     On behalf of DLC and Sprayberry:

 8              ZACHARY M. WILSON, III

 9              Hawkins Parnell Thackston & Young, LLP

10              4000 Sun Trust Plaza

11              303 Peachtree Street, NE

12              Atlanta, GA  30308

13              404.614.7432

14              zwilson@hptylaw.com

15

16

17

18              (Pursuant to Article 10(B) of the Rules and

19     Regulations of the Georgia Board of Court Reporting,

20     a written disclosure statement was submitted by the

21     court reporter to all counsel present at the

22     proceeding.)

23

24

25
```

1              ALLEN MARK STORCH

2      having been first duly sworn, was examined and

3      testified as follows:

4              MR. FRIEDMAN:  We're here for the

5      deposition of Mark Allen Storch and Salon Avenue

6      Suites 30(b)(6), and we've been having a discussion

7      about the underlying liability cases.  And my

8      understanding is that this deposition and Ms. Colon's

9      deposition, which will be taken at a later date, will

10     be used solely for the purposes of Maryland

11     Casualty's lawsuit and cannot be used in any of the

12     underlying liability cases.  And that's the agreement

13     among counsel.  And is everyone going to individually

14     say that that's their understanding as we talked

15     about?

16              MR. YATES:  I agree.

17              MR. FARNSWORTH:  I agree.

18              MR. WATKINS:  Agreed.

19              MR. WILSON:  I agree.

20              MR. KINGSLEY:  I agree with that as well.

21              MR. FRIEDMAN:  And, Blair?

22              MR. CRAIG:  That's fine.

23              We do have one correction in our discovery

24     response.  When we get to it we can make that known

25     to you, when we get to that point.

1          MR. FRIEDMAN:  Okay.

2          MR. CRAIG:  I can't think of anything else.

3          MR. FRIEDMAN:  And then we also agreed that

4    the Jane Doe and Mary Roe, we will be able to use

5    their real names during the deposition but we will

6    insure that they're not filed publicly, their names

7    will be redacted.  And that's acceptable, correct?

8          MR. FARNSWORTH:  It is.

9          MR. YATES:  Yes.  We already said that.

10          MR. CRAIG:  One attorney, one witness?

11          MR. FRIEDMAN:  Yes.  Chris is going to do

12    all the questioning.

13          MR. CRAIG:  That's all you're --

14          MR. FRIEDMAN:  That's all I have to say.

15          MR. CRAIG:  That's your full participation?

16          MR. FRIEDMAN:  I'm here today to --

17          MR. CRAIG:  I understand.  But that's your

18    full participation?

19          MR. FRIEDMAN:  Yes.  I'm making sure we're

20    clear on that.

21          MR. CRAIG:  All right.

22                    ALLEN MARK STORCH

23    having been first duly sworn, was examined and

24    testified as follows:

25                    EXAMINATION

1    BY MR. MEEKS:

2        Q.   Mr. Storch, my name is Christopher Meeks.

3    I represent Maryland Casualty Company.  And we met

4    earlier, but prior to that we have not met before?

**5        A.   That's correct.**

6            MR. MEEKS:  This deposition will be taken

7    in the Maryland Casualty Company versus Salon Avenue

8    Suites case in federal court.

9            Counsel, as to objections, the usual

10   stipulations, reserving all objections except as to

11   the form and responsiveness of the answer?  Is that

12   acceptable to everybody?

13           MR. YATES:  That's fine with me.

14           MR. FARNSWORTH:  Yes.

15           MR. CRAIG:  And any Fifth Amendment

16   objections that may be necessary and any

17   attorney-client objections that may be necessary.

18           MR. FARNSWORTH:  Are you reserving them or

19   are you saying you're going to state them?

20           MR. CRAIG:  I am saying that I'm not -- if

21   I need to make them I'm going to make them now is

22   what I'm saying, Richard.  I'm not reserving them

23   yet.

24           MR. KINGSLEY:  Just a preliminary question.

25   You noticed Mr. Storch individually as well as the

1    30(b)(6).

2            MR. MEEKS:  Yes.

3            MR. KINGSLEY:  Mr. Storch is going to be

4    the 30(b)(6) witness?

5            MR. MEEKS:  I guess we can clarify that.

6    Are we designating Mr. Storch for all the topics?

7            MR. CRAIG:  Tell me how you want to do

8    this, Chris.  Do you want to do the deposition of Mr.

9    Storch and then complete that and then move on to a

10   separate 30(b)(6)?

11           MR. MEEKS:  I had planned on taking them

12   all together.  The questions that I have are a synced

13   set of questions for the 30(b)(6) and for the

14   individual deposition.

15           MR. CRAIG:  So are you going to say -- are

16   you going to distinguish between when he's a 30(b)(6)

17   or are you just asking him all at the same time?

18           MR. MEEKS:  I'm asking him all at the same

19   time.

20           MR. CRAIG:  Okay.  We'll see how that

21   works.

22           MR. MEEKS:  Are you all going to sign the

23   deposition or --

24           MR. CRAIG:  We'll decide at the end.

25   BY MR. MEEKS:

```
 1       Q.  Okay, Mr. Storch, I'm going to ask you a

 2  series of questions about the case and your

 3  involvement.  If you don't hear a question, please

 4  say so and I'll repeat it or have the court reporter

 5  repeat it for you.

 6       Likewise, if you don't understand the

 7  question, ask me to rephrase it and I'll do my best

 8  to rephrase it in a way that you can understand it

 9  better.

10       If you don't tell me that you don't

11  understand the question, I'll assume that you do and

12  that your answer is responsive.  Do you understand?

13       A.  Yes.

14       Q.  As to your answers, please respond with yes

15  or no where appropriate instead of any uh-huhs and

16  huh-uhs.  We need to have a verbal record and that

17  will make it easier for the court reporter.  Do you

18  understand?

19       A.  Yes.

20       Q.  As to my questions, please don't interrupt

21  me during the course of me asking questions and I'll

22  try not to interrupt you while you're giving answers.

23  This will help make the court reporter's job easier

24  when putting together the transcript.

25       If you need a break, please say so, but I
```

1    ask that you answer any questions that are currently

2    pending before you take your break.

3           And do you understand that your testimony

4    is under oath today?

5       **A.  Yes, I do.**

6       Q.  Can you think of any reason today why you

7    can't answer any of the questions I'm about to ask

8    completely?

9       **A.  Yes.**

10      Q.  What reason?

11      **A.  Never mind.  I don't know what you're about**

12   **to ask me.**

13      Q.  Fair enough.

14          Have you taken any medications, anything

15   that will affect your ability to testify prior to the

16   deposition?

17      **A.  No.**

18      Q.  I'm going to show you what we'll mark as

19   Exhibit 1, which is the 30(b)(6) Notice for Salon

20   Avenue Suites, Inc.

21          (Exhibit #1 marked.)

22   BY MR. MEEKS:

23      Q.  I just want to confirm that you're aware

24   that you'll be testifying on behalf of Salon Avenue

25   Suites?

1      A.   (Witness nods head affirmatively).

2      Q.   Is that yes?

3      A.   Yes.

4      Q.   You're prepared to testify on the issues

5   set forth in the Notice?

6      A.   Yes.

7      Q.   And you're also aware this deposition will

8   be taken in your individual capacity?

9      A.   Yes.

10         MR. CRAIG:  To the extent, Chris, that your

11   questions to Salon overlap and involve Mr. Storch

12   personally, then he may have to assert his privilege,

13   so I don't want there to be any confusion about that.

14         MR. MEEKS:  Sure.  I understand.

15   BY MR. MEEKS:

16      Q.   Mr. Storch, would you please state your

17   full name and address for the record?

18      A.   Allen Mark Storch, 2925 Carolyn Street,

19   Marietta, Georgia, 30062.

20      Q.   Have you previously gone under any other

21   names or aliases?

22      A.   I've kind of been known as Mark to friends

23   and family most of my life, but that's it.

24      Q.   Mr. Storch, what's your educational

25   background from high school forward let's say?

1        A.   Finished high school here in Atlanta at

2   Northside High.   Attended University of Miami,

3   graduated from the University of Tampa and then I

4   attended law school here in Atlanta for three years,

5   graduated.

6        Q.   Where did you graduate from law school?

7        A.   It was Woodrow Wilson College of Law at the

8   time.

9        Q.   What year?

10       A.   '85.

11       Q.   Who's is your current employer?

12       A.   Myself.

13       Q.   And prior to being self employed who was

14   your employer?

15       A.   I've been self employed since 1982.

16       Q.   And you've been convicted or pled guilty to

17   one or more felony offenses, is that correct?

18       A.   Yes.

19       Q.   And you're currently on probation in

20   connection with charges for aggravated assault and

21   attempt to rape -- with attempt to rape and

22   possession of cocaine; is that correct?

23       A.   Yes.

24       Q.   And you've served time in prison for these

25   charges?

1       A.   Yes.

2       Q.   You plead guilty to the charges I just

3   listed on or about March of 2004; is that correct?

4       A.   **That is not correct.**

5       Q.   When did you plead guilty to them?

6       A.   **I never pled guilty to them.**

7       Q.   So you were convicted of those charges?

8       A.   **Correct.**

9       Q.   And you received a 15 year sentence for

10  those charges; is that correct?

11      A.   **I received 15, served five.**

12      Q.   Five years in prison?

13      A.   **Correct.**

14      Q.   And 10 years on probation; is that correct?

15      A.   **Correct.**

16      Q.   And you were released from prison on these

17  offenses on or about December of 2008; is that

18  correct?

19      A.   **That's correct.**

20      Q.   And you were registered as a sex offender

21  under Georgia law; is that correct?

22      A.   **Level one, yes.**

23      Q.   And you were registered as a sex offender

24  on or about December of 2008?

25      A.   **To the best of my knowledge.**

```
 1        Q.  And you're still a registered sex offender;
 2   is that correct?
 3        A.  That is correct.
 4        Q.  What is your marital status, Mr. Storch?
 5        A.  I'm married.
 6        Q.  And you are married to Juliette Colon; is
 7   that correct?
 8        A.  That's correct.
 9        Q.  When were you and Ms. Colon married?
10        A.  March of 2009.
11        Q.  Did you know Ms. Colon prior to beginning
12   your prison term?
13        A.  Yes.
14        Q.  And you lived with Ms. Colon after you were
15   released from prison; is that correct?
16        A.  That's correct.
17        Q.  You and Ms. Colon were in business
18   together; is that correct?
19        A.  So to speak.
20        Q.  You operated two salon locations?
21        A.  Suite concept businesses.  They're not
22   salons.  And I built them and got them filled up, but
23   I used a lot of her expertise in creating this
24   business.  Does that answer your question?
25        Q.  Well, so Ms. Colon has experience in the
```

1    beauty industry then?

2         A.   **None whatsoever.**

3         Q.   So the business concept, if I'm correct, is

4    such that you have beauty professionals such as hair

5    stylists, estheticians and the like.  They would rent

6    space from the location to perform their business?

7         A.   **That's correct.**

8         Q.   And one of the locations was located at --

9    or is located at 2550 Sandy Plains Road, Suite 155 in

10   Marietta?

11        A.   **That's correct.**

12        Q.   That's in East Cobb?

13        A.   **Yes.**

14        Q.   Is there another location at 3120 Loring

15   Road?

16        A.   **Yes.**

17        Q.   Is that Suite 7?

18        A.   **It's technically Suite 160 if you really**

19   **want the right mailing address.  It was allocated as**

20   **Suite 7 when it was built and changed.**

21        Q.   And that location is in Kennesaw?

22        A.   **It's in Acworth city limits, Kennesaw**

23   **mailing address.**

24        Q.   When did you begin this business via the

25   salon suite concept?

```
 1          A.   In late 2009.
 2          Q.   And you were responsible for the operation
 3   of the salons?
 4          A.   Yes.  I did operations, yes.
 5          Q.   And did Ms. Colon have involvement in
 6   operating them as well?
 7          A.   No.
 8          Q.   Did you employ any of the lessors or
 9   renters of the salon space?
10          A.   I didn't employ anyone.
11          Q.   And were you present -- how often were you
12   present in one or the other locations?
13          A.   Every day, many times a day.
14          Q.   Were you sometimes present at one in the
15   mornings and one in the afternoon?
16          A.   I split the day.  I would go to one about 6
17   or 7:00 in the morning and I go back and forth and
18   probably end my day at about 6 or 7:00 at night.
19          Q.   Mr. Storch, I'm going to hand you -- the
20   court reporter is going to hand you what we're going
21   to mark as Exhibit 2.
22               (Exhibit #2 marked.)
23   BY MR. MEEKS:
24          Q.   Mr. Storch, do you recognize the document?
25          A.   Yes, I do.
```

1       Q.   And what is it?

2       A.   **It's my business card, temporary business**

3   **card.**

4       Q.   And this business card reflects that you

5   held the position of Vice President of Operations?

6       A.   **I put that on the card, yeah.**

7       Q.   Your position then, what would you consider

8   your position to be with the company?

9       A.   **Operations.  Make sure the place was**

10  **constructed.  I did market analysis, marketing,**

11  **pre-leasing, leasing, maintenance, you name it from**

12  **conception forward, that's what I did.**

13      Q.   So you executed the suite leases, the

14  rental agreements, that sort of thing with the

15  tenants?

16      A.   **Yes.**

17      Q.   And you knew those tenants by name and knew

18  the sort of businesses that they conducted?

19      A.   **Yes.**

20      Q.   And you --

21      A.   **In most cases.  I'm sorry to interrupt you.**

22  **Sometimes they would state that they're coming in as**

23  **a hair stylist and they would come in and start doing**

24  **other services, like nails.  Quite frequently people**

25  **came in under the guise of doing one service and then**

```
 1    began doing another service.

 2        Q.  Did you have the ability to access the

 3    locations?

 4        A.  Yes.

 5        Q.  And did you have the ability to access the

 6    individual suites?

 7        A.  Yes.

 8        Q.  And did you have the ability to access the

 9    interior of the locations to perform maintenance or

10    conduct repairs?

11        A.  Yes.

12        Q.  Mr. Storch, you installed surveillance

13    cameras at both locations, correct?

14        A.  I respectfully invoke my Fifth Amendment

15    privilege under both federal and Georgia law.

16        Q.  Did these cameras operate continually?

17        A.  I respectfully invoke my Fifth Amendment

18    regarding this topic.

19        Q.  You can just say Fifth Amendment.

20            MR. CRAIG:  So we all understand, he can

21    just say Fifth Amendment just for shorthand, Chris,

22    is that fine?

23            MR. MEEKS:  Yes, that's fine.

24    BY MR. MEEKS:

25        Q.  These cameras were positioned over the
```

1  common areas of the locations; is that correct?

2      A.  I'm going to invoke the Fifth.

3      Q.  Did you ever have any complaints about any

4  crimes being committed at either location?

5      A.  Yes.

6      Q.  What sort of crimes?

7      A.  There were allegations, rumors, granted

8  we're dealing with a rumor, that drugs were being

9  sold out of one of the suites in Marietta.

10     Q.  That would be the Sandy Plains location?

11     A.  Sandy Plains, yes.  And there were a couple

12  of others that don't come to mind right now.  There

13  were multiple and ongoing repeated allegations of

14  cigarette smoking, marijuana smoking and

15  methamphetamine use in one particular bathroom in

16  Acworth.

17     Q.  Did you ever report any of these suspicions

18  or rumors to law enforcement?

19     A.  I'm going to invoke the Fifth on that.

20     Q.  Who alleged that there were these criminal

21  activities taking place?

22     A.  I'm going to invoke the Fifth on that

23  because I can't adequately answer that question.

24     Q.  What were the basis for your suspicions?

25     A.  Traffic -- regarding the first instance, a

```
 1    lot of traffic, people coming and going and leaving

 2    with packages, the type of individuals obviously

 3    weren't there for a hair service or to purchase a

 4    product.  As the person who first came in and cleaned

 5    toilets and swept floors in the morning I saw

 6    cigarettes, I recognized the lingering smell of

 7    marijuana, and I saw things on the ground that later

 8    someone told me was more than likely paraphernalia

 9    from methamphetamine use.

10        Q.  Who did you suspect was engaging in this

11    behavior?

12        A.  I didn't know who to suspect initially.

13        Q.  Who told you that this behavior was going

14    on?

15        A.  Several occupants told me that this was

16    going on, and they threatened to leave because their

17    clientele was being offended.  It was jeopardizing

18    their livelihood and that I would be left with a

19    center with very few people.

20        Q.  Can you identify those occupants?  By

21    occupants I'm assuming you mean the tenants?

22        A.  Not at this time.

23        Q.  Can you identify the sort of businesses

24    that they ran?

25        A.  They were hair stylists.
```

1      Q.   And which locations were they at?

2      A.   **If you're talking in general regarding**

3   **criminal activity, both locations.**

4      Q.   How many at the Loring Road location, for

5   instance?

6      A.   **I don't recall.**

7      Q.   And how many at the Sandy Plains Road

8   location?

9      A.   **Exact number I don't recall, but several.**

10     Q.   Did you ever have any suspicions that any

11   of the tenants were engaging in any illegal activity?

12     A.   **Yes.**

13     Q.   And what type of legal activity?

14     A.   **I wasn't particularly certain.  I don't**

15   **know.**

16     Q.   Do you know who -- who in specific did you

17   suspect of engaging in illegal activity?

18     A.   **I'm going to respectfully invoke my Fifth**

19   **Amendment right on that.**

20     Q.   When did you suspect that these tenants

21   engaged in illegal activity?

22     A.   **I don't remember, but it was within the**

23   **first six months of opening the Marietta location,**

24   **and then it was around May, June of 2012 in Acworth.**

25     Q.   When did you open the Marietta location?

```
 1        A.  Officially 2010.

 2        Q.  When in 2010?

 3        A.  March I believe, March or April.  But I

 4   started construction in 2009.

 5        Q.  And these suspicions with regard to the

 6   tenants, did you ever refer any of those suspicions

 7   to law enforcement?

 8        A.  I'm going to invoke my Fifth on that.

 9        Q.  Did you ever discuss any of these

10   suspicions with Ms. Colon?

11        A.  Yes.

12        Q.  And what did you tell Ms. Colon about those

13   suspicions?

14        A.  Exactly what I told you.

15        Q.  Did you ever discuss any of these

16   suspicions with an attorney or some sort of business

17   advisor?

18        A.  I respectfully invoke the Fifth Amendment.

19        Q.  Going back to the cameras, did anybody

20   request that you install cameras in the location?

21        A.  I invoke the Fifth on that.

22        Q.  Did you install cameras to monitor tenants'

23   activities?

24        A.  I'll respectfully invoke the Fifth

25   Amendment privilege on that.
```

1      Q.  Did you install cameras in individual

2    suites to monitor tenant activities?

3      A.  I respectfully invoke the Fifth regarding

4    that question.

5      Q.  Did you ever advise any of your tenants or

6    their customers that there were cameras installed in

7    the locations?

8      A.  Can you clarify the question, please?

9      Q.  I'll break it into two.  Did you ever

10   advise the tenants or their customers that there were

11   cameras installed that were monitoring the common

12   areas of the locations?

13     A.  I would like to answer your question in

14   that as soon as we opened, prior to opening we put

15   stickers up everywhere.  We didn't have it in the

16   budget to put an elaborate system in right when we

17   opened up.  So there are stickers and have been ever

18   since the day of opening that I got off the internet

19   and purchased for like 399 that says surveillance in

20   use.  So those are plastered pretty much everywhere.

21     Q.  Did you ever advise any of the tenants or

22   their customers that there were cameras monitoring

23   activities in any of the suites?

24     A.  I'm going to invoke the Fifth Amendment

25   privilege on that.

1        Q.   Did you ever advise any of the tenants or

2    their customers that there were cameras monitoring

3    activities inside any of the bathrooms?

4        A.   I invoke the Fifth on that.

5        Q.   You mentioned something about the system.

6    In May or June of 2012 you upgraded or updated the

7    cameras at these locations; is that correct?

8        A.   I invoke the Fifth on that.

9        Q.   Did you upgrade the cameras to a higher

10   resolution model?

11       A.   Same answer.   Invoking the Fifth.   Same

12   question.

13       Q.   Did the cameras have the ability to record

14   sound?

15       A.   Invoking my Fifth.

16       Q.   The cameras were not monitored by any

17   security firm or security service; is that correct?

18       A.   I'll invoke my Fifth Amendment privilege.

19       Q.   The cameras were connected to a laptop

20   computer; is that correct?

21       A.   Not that I'm aware of.

22       Q.   The cameras were connected to any sort of

23   recording devices?

24       A.   I'm going to have to invoke my Fifth

25   Amendment privilege on that.

Case 1:13-cv-03056-TWT   Document 82-1   Filed 07/07/14   Page 26 of 68

Maryland Casualty vs. Salon Ave.    Mark Storch, 30(b)(6) & Indv.                05/14/2014

```
 1        Q.  Was this recording device located inside

 2    the Salon Suite locations?

 3        A.  I'm going to invoke my Fifth.

 4            MR. CRAIG:  That's all you need to say.

 5    BY MR. MEEKS:

 6        Q.  Were you the only person that had access to

 7    this recording device or these recording devices?

 8        A.  I'm going to invoke the Fifth.  You're

 9    continuing to make assumptions on something I've

10    already invoked the Fifth on.

11        Q.  Mr. Storch, we're entitled to ask questions

12    in the deposition --

13        A.  I understand.

14        Q.  -- and to the extent -- your attorney is

15    the one to put forth the objections to the questions.

16            Were you able to review the images recorded

17    by the cameras at the location?

18        A.  I'll invoke my Fifth Amendment privilege.

19        Q.  At the Sandy Plains location you installed

20    cameras outside the back door?

21        A.  I'll invoke my Fifth Amendment privilege.

22        Q.  In the break room?

23        A.  I'll invoke the Fifth.

24        Q.  The rear of the hallway?

25        A.  I'm invoking the Fifth.
```

1        Q.   The front of the hallway?

2        A.   **Fifth Amendment.**

3        Q.   There was a camera over a suite at the

4    Sandy Plains location; is that correct?

5        A.   **Invoking my Fifth Amendment privilege.**

6        Q.   There was a suite at the Sandy Plains

7    location that was leased to a woman named Marcia

8    Mary Roe is that right?

9        A.   **Yes, I believe so.**

10       Q.   And Ms. Mary Roe operated a Brazilian wax

11   studio we'll call it; is that correct?

12       A.   **To the best of my knowledge, I believe,**

13   **yes.**

14       Q.   And Brazilian wax involves the removal of

15   hair from the pubic area; is that correct?

16       A.   **I don't -- at the time did not know what**

17   **Brazilian wax was.   Sorry.**

18       Q.   Did you understand at the time that a

19   Brazilian wax customer must be partially nude to

20   engage in the Brazilian wax process?

21       A.   **No.**

22       Q.   And did Ms. Mary Roe suite have a door

23   that could be closed?

24       A.   **Yes, it did.**

25       Q.   Do the doors have locks?

1      A.   Yes, they do.

2      Q.   Did you install a camera over Ms.

3   Mary Roe  suite at the Sandy Plains location?

4      A.   I'll invoke my Fifth Amendment privilege on

5   that.

6      Q.   Did you have permission from Ms. Mary Roe

7   to install a camera over her suite?

8      A.   I'll invoke my Fifth Amendment privilege.

9      Q.   Both locations had restrooms for customers

10  and tenant use; is that correct?

11     A.   That's correct.

12     Q.   Was it a male and female bathroom or was it

13  a unisex bathroom?

14     A.   Unisex.

15     Q.   There was a camera installed with a view of

16  the interior of the restrooms at the Loring Road

17  location; is that correct?

18     A.   I would like to invoke my Fifth Amendment

19  privilege on that question.

20     Q.   Was that camera installed in the restroom?

21     A.   I would like to invoke my Fifth Amendment

22  privilege.

23     Q.   These restaurants have doors, correct?

24     A.   Yes.

25     Q.   And the restrooms were single occupancy; is

1    that correct?

2         A.   The one in Marietta is kind of not.  One

3    has a urinal and a regular stall, so technically two

4    people could use that one.  The ones in Acworth are

5    really big and --

6         Q.   How many?  I'm sorry.  Go ahead.

7         A.   Because of ADA regulations and the city of

8    Acworth, we had to make those bathrooms really large.

9    So as far as single occupancy goes --

10        Q.   How many toilets were in the one on Loring

11   Road?

12        A.   Three.

13        Q.   Were they separated by dividers?

14        A.   Yes.

15        Q.   Were there cameras installed to view inside

16   each one of the partitioned toilet areas?

17        A.   I will invoke my Fifth Amendment privilege

18   on that.

19        Q.   You never had permission from any tenants

20   or tenant's customer to record them while using the

21   restroom; is that correct?

22        A.   I'll invoke my Fifth Amendment privilege on

23   that.

24        Q.   Heather Bowen was a tenant at the Loring

25   Road location; is that correct?

1      A.   She went by a couple of different names,

2   but I think I know who you're talking about.   I'm

3   assuming she's one of the named plaintiffs in this

4   action?

5      Q.   That's correct.   She's identified as

6   Heather Bowen on the Notice.

7      A.   I think I know who you're talking about.

8   She was a co-tenant, yes.

9      Q.   She's an esthetician, correct?

10     A.   As far as I knew.

11     Q.   Part of her business involves the removal

12   of body hair; is that correct?

13     A.   I'm not aware of that.

14     Q.   And you're aware that her customers were

15   required to be nude or partially nude during their

16   hair removal treatments?

17     A.   I didn't know she was doing that.   In fact,

18   that was not stated on her contract.   She never

19   mentioned she was doing that and everyone talked

20   about how great her facials were.

21     Q.   And Ms. Bowen's suite had a door, correct?

22     A.   Yes.

23     Q.   And that door could be locked closed?

24     A.   Yes, that's correct.

25     Q.   Mr. Storch, did you ever patronize any of

```
 1   the Salon Suite tenants?

 2        A.   Yes.

 3        Q.   Did you ever do any business with Ms.

 4   Mary Roe

 5        A.   Yes.

 6        Q.   Ms. Mary Roe performed hair removal

 7   services for you; is that correct?

 8        A.   I'm going to invoke my Fifth Amendment

 9   privilege on that.

10        Q.   Ms. Mary Roe removed perhaps some hair from

11   your chest or your back?

12        A.   I'm going to invoke the Fifth Amendment

13   privilege.

14        Q.   There was a camera installed over Ms.

15   Bowen's suite at the Loring Road location; is that

16   correct?

17        A.   I'm going to invoke my Fifth Amendment

18   privilege for that one.

19        Q.   You did not have permission to install a

20   camera over Ms. Bowen's suite at the Loring Road

21   location; is that correct?

22        A.   I'll invoke the Fifth Amendment privilege.

23        Q.   And prior to July of 2012 did you ever

24   receive any complaints about the presence of any

25   cameras at either location?
```

1      A.  I'll invoke the Fifth.

2      Q.  I understand you invoked the Fifth, but did

3   you ever contact Maryland Casualty Company concerning

4   any complaints that you may have received about

5   cameras?

6      A.  I don't remember.

7      Q.  On July 27, 2012, you were arrested; is

8   that correct?

9      A.  I'm not sure of that certain date but that

10  sounds about right.

11     Q.  Well, you were arrested at the Sandy Plains

12  location in July of 2012?

13     A.  No.  I was held against my will there for

14  an hour or two, but I was not arrested there, no.

15     Q.  I'm going to hand the court reporter what

16  we'll mark as Exhibit 3.

17          (Exhibit #3 marked.)

18  BY MR. MEEKS:

19     Q.  Mr. Storch, I'm going to ask you do you

20  recognize this document?

21     A.  I do not.

22     Q.  Does it refresh your recollection that the

23  police were called to the Sandy Plains location on

24  July 27, 2012?

25     A.  Yes.

1      Q.  And on July 27, 2012, the police were

2  called to the Sandy Plains location in response to a

3  complaint that a camera had been found; is that

4  correct?

5      A.  I'll invoke my Fifth Amendment privilege on

6  that.

7      Q.  And that camera was found by Ms. Mary Roe

8  and one of her clients; is that correct?

9      A.  I'm going to invoke the Fifth Amendment on

10  that.

11      Q.  Ms. Mary Roe client was Jane Doe

12  is that correct?

13      A.  I would have no way of knowing that.

14      Q.  Ms. Mary Roe and Ms. Jane Doe found a

15  camera above Ms. Mary Roe salon suite; is that

16  correct?

17      A.  I would like invoke my Fifth Amendment

18  privilege on that.

19      Q.  Were you viewing the video activity or

20  video feed from a camera over Ms. Mary Roe suite on

21  July 27, 2012?

22      A.  No.

23      Q.  Did you see Ms. Mary Roe and Ms. Jane Doe

24  discover the camera?

25      A.  I did not.

```
 1          Q.  You were at the Sandy Plains location on

 2     July 27, 2012?

 3          A.  I was there every day.

 4          Q.  When did you arrive that day?

 5          A.  I don't remember.

 6          Q.  When you arrived, you had an encounter with

 7     Ms. Mary Roe is that correct?

 8          A.  I'll invoke my Fifth Amendment privilege on

 9     that.

10          Q.  When you met with Ms. Mary Roe or

11     encountered Ms. Mary Roe on July 27, you asked her

12     why she was upset about the camera; is that correct?

13          A.  I'll invoke my Fifth Amendment privilege on

14     that.

15          Q.  Did you tell her that the police called you

16     about the presence of the camera?

17          A.  I'll invoke my Fifth on that.

18          Q.  Did you tell Ms. Mary Roe that you

19     installed the camera in her suite to monitor a body

20     wrap studio?

21          A.  No, I did not.

22          Q.  Was there a body wrap studio at any point

23     in time at the Sandy Plains location?

24          A.  Yes.

25          Q.  And what was the name of that body wrap
```

```
 1    studio?

 2         A.   I don't remember.   I don't think it was in

 3    her suite.   I don't remember.

 4         Q.   And so you don't remember if it was in her

 5    suite?

 6         A.   I don't think it was.

 7         Q.   Do you recall who the owner of the body

 8    wrap studio was?

 9         A.   I should.   She stiffed us for a few grand

10    and ran.   No, I don't remember her name.

11         Q.   Did you suspect that the body wrap studio

12    -- somebody in the body wrap studio was engaging in

13    illegal behavior?

14         A.   I'm going to invoke my Fifth Amendment

15    privilege on that.

16         Q.   What sort of illegal activities did you

17    suspect were engaged in at the body wrap studio?

18         A.   I'm going to invoke my Fifth.

19         Q.   Did you speak with an attorney about any

20    suspicions of illegal activities at the body wrap

21    studio?

22         A.   I'll invoke my Fifth Amendment privilege on

23    that.

24         Q.   Did you inform law enforcement of any

25    suspicions with regard to the body wrap studio?
```

1        A.  I'll invoke my Fifth.

2        Q.  And did you confront this tenant about any

3    of those suspicions, the tenant in the body wrap

4    studio?

5        A.  I'll invoke my Fifth.

6        Q.  Did you evict this tenant from the body

7    wrap studio?

8        A.  No.

9        Q.  Body wrap involves undressing of the

10   customers; is that correct?

11       A.  I'll invoke my Fifth on that.

12       Q.  You were unconcerned that people would

13   object to the presence of the camera in the body wrap

14   studio?

15       A.  I'll invoke my Fifth Amendment privilege on

16   that.

17       Q.  And did you remove the camera after this

18   tenant left?

19       A.  I'll invoke my Fifth Amendment privilege.

20       Q.  The court reporter will hand you what we're

21   going to mark as Exhibit 4.

22           (Exhibit #4 marked.)

23   BY MR. MEEKS:

24       Q.  Mr. Storch, do you recognize this document?

25       A.  It looks familiar.

1     Q.   Is that your signature on the bottom left
2   of the first page?

3     A.   **It appears to be at first glance.**

4     Q.   This is a standard service agreement with
5   Ms. Mary Roe is that correct?

6     A.   **It appears to be.**

7     Q.   Ms. Mary Roe had Suite Number 110?

8     A.   **According to this document.**

9     Q.   Ms. Mary Roe suite had been in operation
10  since February of 2012, February 8; is that correct?

11    A.   **I don't know.   I'm not trying not to answer**
12  **your question.   Some people when they sign the**
13  **agreement they get weeks free or they move in prior**
14  **to based on incentives we give, so I can't answer**
15  **your question with absolute certainty.**

16    Q.   Ms. Mary Roe was operating a suite out of
17  the Sandy Plains location in July of 2012, correct?

18    A.   **To the best of my knowledge.**

19    Q.   How many months had she been there, had she
20  been operating at that time?

21    A.   **If you take it as this is the effective**
22  **date, then that would be five months, assuming this**
23  **document is the true and correct document.**

24    Q.   Do you have any reservations to its
25  authenticity?

1      A.  Yes, I do.

2      Q.  What are those?

3      A.  Only that I would have to compare it to the

4  original.  I find it a little odd that the initials

5  aren't signed on page four.  We usually require

6  everyone to initial and sign on all pages.  Other

7  than that, it appears to be about right.

8      Q.  But you don't dispute that Ms. Mary Roe did

9  execute a standard service agreement with Salon

10  Avenue Suites, is that correct, for the Sandy Plains

11  Road location?

12      A.  I'll respectfully invoke my Fifth Amendment

13  privilege on that question.

14      Q.  You knew that there was a camera present

15  over Ms. Mary Roe suite on or before July 27, 2012;

16  is that correct?

17      A.  I will respectfully invoke my Fifth

18  Amendment privilege.

19      Q.  And you did not have permission from Ms.

20  Mary Roe to install a camera in her suite or over her

21  suite?

22      A.  I respectfully invoke my Fifth Amendment

23  privilege.

24      Q.  Did Ms. Mary Roe threaten to sue you on

25  July 27, 2012?

1          A.   Fifth Amendment.

2          Q.   Did Ms. Jane Doe threaten to sue you on

3     July 27, 2012?

4          A.   Fifth Amendment.

5          Q.   Ms. Mary Roe advised you that the police

6     had been called, that's correct?

7          A.   Fifth Amendment.

8          Q.   After you learned that the police had been

9     called, did you remove recording equipment from the

10    Sandy Plains location?

11         A.   No.

12         Q.   Did you place any recording equipment in

13    your vehicle?

14         A.   No.

15         Q.   You were Mirandized by the police on July

16    27, 2012?

17         A.   I don't remember.

18         Q.   You were or were not placed in police

19    custody?

20         A.   I was not arrested, no.  They held me in a

21    suite for questioning.  I tried to leave but they

22    wouldn't let me go.

23         Q.   Was your vehicle impounded on July 27,

24    2012?

25         A.   Yes, it was.

1        Q.   Did you refuse the police to search your

2   vehicle?

3        **A.   Initially.**

4        Q.   The police executed a search warrant on the

5   Loring Road location; is that correct?

6        **A.   I don't know.   I haven't seen it.**

7        Q.   Mr. Storch, the court reporter is going to

8   hand you what we're going to mark as Exhibit 5.

9             (Exhibit #5 marked.)

10  BY MR. MEEKS:

11       Q.   Mr. Storch, do you recognize this document?

12       **A.   I do not.**

13       Q.   Did you ever speak with Ms. Colon about a

14  search, a police search at the Loring Road location?

15       **A.   I'll invoke my Fifth Amendment privilege on**

16  **that.**

17       Q.   Were you present for any search by the

18  police at the Loring Road location?

19       **A.   Not to the best of my knowledge.**

20       Q.   Were you present when the police -- during

21  a police search of the Sandy Plains location?

22       **A.   I'll invoke my Fifth Amendment privilege on**

23  **that.**

24       Q.   Does this refresh your recollection that

25  the police were called to the Loring Road location on

```
 1    August 10, 2012?

 2         A.   No.

 3         Q.   You had no knowledge of the police being

 4    called to the Loring Road location on August 10,

 5    2012?

 6         A.   No.

 7         Q.   Do you recognize the name Myriam Alvarado?

 8         A.   I have no idea who that is.

 9         Q.   If you turn to the last page of that

10    document for me.  You agree that this page that's

11    marked Incident Report Suspect List and lists you as

12    the only entry?

13         A.   I can only testify to what this photocopied

14    document labeled Exhibit 5 shows.

15         Q.   Do you know why you would be listed on a

16    suspect list with this police report?

17         A.   I'll invoke my Fifth Amendment privilege on

18    that question.

19         Q.   Mr. Storch, were you arrested on August 10,

20    2012?

21         A.   I think it was the day -- I forgot.

22         Q.   So you were arrested on the day of this

23    police report, August 10, 2012; is that correct?

24         A.   I can't confirm that.

25         Q.   You do recall being arrested in August of
```

```
 1    2012?

 2         A.  Yes, I do.

 3         Q.  Can you give us an idea of when that might

 4    have been, date range, day of the week?

 5         A.  It's all a blur.  You think you would

 6    remember stuff like that.  It was like 2:00 in the

 7    morning on a Friday night or Saturday night.  It was

 8    in the middle of the night.

 9         Q.  It was in the middle of the night?

10         A.  Yes.

11         Q.  And you think it was on a Friday?

12         A.  It could have been any day of the week.

13         Q.  Was it early August?  Does that sound

14    familiar?

15         A.  Approximately, yes, that seems about right.

16         Q.  So your testimony is you were unaware of

17    the police search being conducted at Loring Road

18    location?

19         A.  I'll invoke my Fifth Amendment privilege on

20    that.

21         Q.  Were you aware that during a police search

22    of the Loring Road location that cameras were found

23    in or pointed at the restroom?

24         A.  I'll assert my Fifth Amendment privilege on

25    that.
```

1      Q.   Did you install the cameras at the Loring

2  Road location?

3      A.   Fifth.

4      Q.   Mr. Storch, did minors use the restrooms at

5  the Loring Road location?

6      A.   I'll assert my Fifth Amendment privilege on

7  that.

8      Q.   Mr. Storch, are you aware that the police

9  found a camera over Heather Bowen's suite at the

10  Loring Road location?

11      A.   No.

12      Q.   Did you install a camera over Ms. Bowen's

13  suite at the Loring Road location?

14      A.   I'll invoke my Fifth Amendment privilege on

15  that.

16      Q.   Did you ever suspect Ms. Bowen of any

17  illegal activity?

18      A.   I'll invoke the Fifth.

19      Q.   Did you have permission from Ms. Bowen to

20  install any cameras over her suite?

21      A.   I'll invoke my Fifth Amendment privilege.

22      Q.   The police found in their search a computer

23  at the Loring Road location; is that correct?

24      A.   I think so, yes.

25      Q.   That computer was connected to the cameras

at the Loring Road location; is that correct?

**A. I'll invoke my Fifth Amendment right on that.**

Q. And did the computer record images from those cameras?

**A. I'll invoke my Fifth Amendment privilege on that.**

Q. So it's your testimony that you were arrested in early August of 2012, in the middle of the night; is that correct?

**A. That's correct.**

Q. And on or about August 10, does that sound correct?

**A. Give or take.**

Q. And at the time you were arrested were you aware that you could face charges for videotaping one or more people at the Sandy Plains location?

**A. No. I was in shock.**

Q. Were you aware that you would face charges for videotaping one or more people at the Loring Road location?

**A. I'll invoke my Fifth Amendment on that.**

Q. When did you learn the basis for your arrest?

**A. A few days after being incarcerated.**

```
 1        Q.   What were you told about the basis for your

 2    arrest?

 3        A.   I was told by my attorney, so that's

 4    privileged information; and I'll invoke my Fifth

 5    privilege on that question.

 6        Q.   Were you brought before a judge?

 7        A.   I think there was a preliminary.

 8        Q.   Was there some sort of arraignment or bond

 9    hearing, something to that effect?

10        A.   No, there wasn't.

11        Q.   So you weren't placed on bond or bail?

12        A.   Eventually, yes.

13        Q.   Were you bailed out or bonded out of jail?

14        A.   After 90 days, yes.

15        Q.   And who bonded or bailed you out?

16        A.   I did.

17        Q.   And how did you go about doing that?

18        A.   Just took money out of my checking account.

19        Q.   And did you have a portion of your

20    probation revoked because of your arrest?

21        A.   90 days.

22        Q.   When were you released from jail after you

23    were arrested?

24        A.   November 18ish.  It would have been about

25    96 days from the date that you're saying I was
```

1    arrested, give or take.  That's an accurate date.

2         Q.  That sounds accurate to you?

3         A.  Yeah, I think it was 96 days.

4         Q.  So do you recall how soon after you were --

5    you were not brought before a judge for a preliminary

6    hearing -- or you were; is that correct?

7         A.  I guess.  It's all a blur.

8         Q.  Were you aware during your incarceration

9    between August and November that you could face

10   charges for videotaping one or more people at either

11   location?

12        A.  Repeat that question, please.

13        Q.  During the period of time that you were in

14   jail between August and November you were aware while

15   you were in jail that you could face charges for

16   videotaping one or more people?

17        A.  I'll invoke my Fifth Amendment privilege on

18   that.

19        Q.  Mr. Storch, the court reporter is going to

20   hand you what we've marked as Exhibit 6.

21             (Exhibit #6 marked.)

22   BY MR. MEEKS:

23        Q.  Just take your time to review it.  Do you

24   recognize this document?

25        A.  Not to the best of my ability, no.  That

 1    was two years ago.

 2         Q.  Do you recognize any portion of the

 3    document separate from the whole?

 4         A.  It says redacted on it.  What does that

 5    mean?

 6         Q.  The redactions were made in connection with

 7    the name of the plaintiff -- well, let me ask you

 8    this.  Do you recall that you were sued by a woman

 9    named Jane Doe?

10         A.  Yes.

11         Q.  Or identified as Jane Doe?

12         A.  Yes.

13         Q.  The redactions are consistent with

14    identification of Ms. Jane Doe, just for your

15    information.

16              So the redaction covers up what is her

17    actual name.  So you do recall that you were sued by

18    a woman identified as Jane Doe?

19         A.  Yes.

20         Q.  At page beginning MCC and etcetera on the

21    bottom right, if you could turn to page 890.

22         A.  Okay.

23         Q.  Do you recall being served with a complaint

24    by Jane Doe or a woman identified as Jane Doe?

25         A.  I don't remember.

1      Q.   So you do not recall being served with a

2  complaint by a woman identified by the name Jane Doe?

3      **A.   Not to the clarity that I can say with**

4  **absolute certainty that this was it.**

5      Q.   Do you recall receiving service of a legal

6  document in February  2013?

7      **A.   No, I don't remember.**

8      Q.   Mr. Storch, if you could just turn to the

9  front of that packet for me.   The Dickerson Agency,

10  that was the insurance agent for Salon Avenue Suites

11  Inc.; is that correct?

12      **A.   Yes.**

13      Q.   They were your insurance agent for personal

14  insurance as well?

15      **A.   I'll take the Fifth on that.**

16      Q.   You obtained insurance policies for Salon

17  Avenue Suites Inc. through the Dickerson Agency; is

18  that correct?

19      **A.   That's not correct.**

20      Q.   Did you provide a copy -- who obtained the

21  policies for Salon Avenue Suites, Inc.?

22      **A.   I'll respectfully invoke the Fifth**

23  **Amendment privilege on that.**

24      Q.   Was it an insurance agency?

25      **A.   I would like to answer your question but I**

```
 1    can't.  I have no idea.
 2         Q.  You provided a copy of the Jane Doe
 3    complaint to the Dickerson Agency on or before March
 4    11 of 2013; is that correct?
 5         A.  I'll respectful invoke my Fifth Amendment
 6    privilege on that question.
 7         Q.  And on March 11, 2013, the Dickerson Agency
 8    sent a copy of the Jane Doe complaint to Maryland
 9    Casualty Company; is that correct?
10         MR. CRAIG:  Objection; speculation.
11         A.  How would I know that?
12    BY MR. MEEKS:
13         Q.  I'll withdraw the question.
14         Prior to March 11, 2013, you never informed
15    Maryland Casualty Company of any claims or
16    allegations that you or Salon Avenue Suites were
17    recording women while undressed or using the
18    restroom; is that correct?
19         A.  I'll invoke my Fifth Amendment privilege on
20    that question.
21         Q.  You didn't advise Maryland Casualty Company
22    of your arrest prior to March 11 of 2013; is that
23    correct?
24         A.  I'll invoke my Fifth Amendment privilege on
25    that.
```

1      Q.  Did anyone provide notice of your arrest to

2  Maryland Casualty Company on your behalf prior to

3  March 11, 2013?

4      A.  I'll invoke the Fifth.

5      Q.  You did not notify Maryland Casualty

6  Company of any police search or search warrant on the

7  Loring Road location prior to March 11, 2013?

8      A.  I'll invoke my Fifth Amendment.

9      Q.  Do you know if anyone provided notice on

10  your behalf of that police search to Maryland

11  Casualty Company?

12      A.  I can't say with certainty.  Sorry.  I'm

13  sure it's documented somewhere.  And I don't mean to

14  be evasive here, but I can't answer your question.

15      Q.  So you're asserting that you did provide

16  notice prior to March 11?

17      A.  I'm asserting my Fifth Amendment privilege

18  to answer that question directly.

19      Q.  Are you asserting that there are any

20  documents that show the existence of notice prior to

21  March 11, 2013?

22      A.  That is correct.

23      Q.  Do you have those documents in your

24  possession?

25      A.  I'll assert my Fifth Amendment privilege on

1    that.

2        Q.   Other than the lawsuit by the woman

3    identified as Jane Doe and the criminal charges

4    against you, did you receive any written demands

5    against yourself or Salon Avenue Suites based on any

6    allegation you were recording women while undressed

7    or using the restroom at either location?

8        A.   I'll invoke my Fifth Amendment privilege on

9    that.

10       Q.   Prior to March 11, 2013, did you ever

11   receive any verbal demands or threats that you were

12   videotaping or recording women while undressed or in

13   the restroom?

14       A.   I'll invoke the Fifth.  I'm not clear on

15   what your question -- how about this, can you please

16   repeat the question?  I'm going to try to answer it.

17            (Reporter read requested portion.)

18       A.   That's a loaded question.

19            MR. CRAIG:  From whom?  He could have

20   spoken with an attorney.

21   BY MR. MEEKS:

22       Q.   Any demands from anybody claiming that they

23   had been videotaped or recorded.

24       A.   I'll assert my Fifth Amendment on that

25   question.

1      Q.  So you're asserting your Fifth in

2  connection with -- let's clarify this.

3          Did you receive any verbal demands or

4  threats from any women who claim that you had

5  recorded them while undressed, partially undressed or

6  using the restroom prior to March 11, 2013.

7          MR. CRAIG:  I'm going to object to the

8  question because I think that verbal demands, the

9  term verbal demands and the term threats is so

10 subjective I'm not sure -- so I'm going to object on

11 that basis.

12 BY MR. MEEKS:

13     Q.  Let my rephrase again.

14         Prior to March 11, 2013, did you receive

15 any demands for money or payment of money from any

16 women who claimed that they had been recorded or

17 videotaped and in a state of undress or while using

18 the restroom?

19     A.  To the best of my knowledge, no.

20     Q.  Mr. Storch, on July 25, 2013, you were

21 indicted by a Cobb County grand jury; is that

22 correct?

23     A.  I'll assert my Fifth Amendment privilege on

24 that.

25     Q.  You've been indicted on 25 felony counts

1   relating to the presence of the cameras at the Loring

2   Road and Sandy Plains Road locations?

3        **A.   I'll assert my Fifth Amendment privilege on**

4   **that.**

5            MR. MEEKS:  We're going to take a short

6   break and go off the record.

7            (Recess 11:26 a.m.- 11:50 a.m.)

8   BY MR. MEEKS:

9        Q.   Mr. Storch, I want to go back and clarify a

10  few things.

11           The first thing is, so you're aware that

12  you had, that Salon Avenue Suites had a policy

13  through Farmers Insurance?  Is that your

14  understanding of the company?

15       **A.   Yes, I believe that was the entity.**

16           MR. CRAIG:  I object to the form of the

17  question.

18  BY MR. MEEKS:

19       Q.   Prior to March 11, 2013, did you receive

20  any demands for the payment of money from anyone who

21  claimed that they had been recorded by you,

22  videotaped by you at any of the salon locations?

23       **A.   I would have to invoke the Fifth on that.**

24       Q.   Prior to March 11, 2013, had you received

25  any threats from anyone who claims that they had been

1    recorded or videotaped by you at either salon

2    locations that they were going to file suit against

3    you?

4        **A.  I invoke the Fifth.  I don't recall.**

5        Q.  Which is it?  If you don't recall, that's

6    different than pleading the Fifth.

7        (Off-the-record discussion).

8        **A.  Under advice of counsel I think I will**

9    **answer your question as best I can.  Can you repeat**

10   **it?**

11       (Reporter read requested portion.)

12       **A.  Not that I'm aware.**

13   BY MR. MEEKS:

14       Q.  You testified earlier that you had done

15   some business with Ms. Mary Roe is that correct?

16       **A.  In my capacity as?**

17       Q.  Personally.

18       **A.  Personally?**

19       Q.  Personally.

20       MR. CRAIG:  Do you mean a customer?

21   BY MR. MEEKS:

22       Q.  As he was a customer for hair removal

23   purposes; is that correct?

24       **A.  Yes.**

25       Q.  Yes or no?

 1        A.   Yes.

 2        Q.   You had an appointment?

 3        A.   Yes.

 4        Q.   At her suite?

 5        A.   Yes.

 6        Q.   And she removed some hair for you?

 7        A.   Yes, she did.

 8        Q.   Bodily hair.  Mr. Storch, did you have to

 9   remove any articles of clothing when she performed

10   this service for you?

11        A.   No.

12        Q.   And what hair, if you don't mind?

13        A.   I had a short sleeved shirt on and it was

14   summertime so I rolled it up and she did that

15   unsightly hair I have right there.

16        Q.   Like upper arm, shoulder area?

17        A.   Kind of not really shoulders too bad, but I

18   had this hair growing back here and she waxed it two

19   or three times.

20        Q.   Let's go back to -- you said earlier that

21   you had been convicted of some charges relating to

22   attempted rape and cocaine possession in 2004?

23        A.   That's correct.

24        Q.   And what were the basis for those charges?

25        A.   Well --

```
 1            MR. CRAIG:  You mean what were the

 2    allegations against him?

 3            MR. MEEKS:  Yes, what were the allegations

 4    against him.

 5            MR. CRAIG:  Not necessarily that he agrees

 6    but what was alleged?

 7            MR. MEEKS:  Yes.

 8       A.  What was alleged was that a girlfriend of

 9    mine came over to my house, and I was in the process

10    of breaking up with her.  I actually broke up with

11    her over the phone.

12            One night we just met and I thought let me

13    talk to her, tell her to her face.  We had been going

14    out for about three years.  So she came over -- no,

15    we met at a lounge and then I left, and she said

16    where are you going, and I said I'm going home, it's

17    late.  So she followed me to my house.  So we sat on

18    the sofa and I tried to reason with her.  I said this

19    is when I met my now wife.  I had planned on getting

20    engaged.  So I had a relationship with her and I

21    wanted to end it so I could become serious with

22    Juliette.  And she didn't take it too well.

23            She, when she came to my home she opened a

24    bottle of wine, drank almost the whole thing and

25    threw the empty bottle at a brand new plasma TV.  Now
```

1   in 2003 a plasma TV was a big deal.  So I got really

2   upset.  And then she started tearing stuff up.  So I

3   said stop, stop.  Physically I actually put my hands

4   on her and told her to stop.  And she slapped me.

5   But I never slapped her or anything.  Granted, things

6   calmed down.  She was intoxicated.  I did not want

7   her to leave.  I made a pot of coffee.  It was 4:00

8   in the morning before she would stop talking and

9   telling me how awful I am for doing all this.  I

10  believe she thought we were going to get married.

11  And I felt bad.

12          And then she started to come on to me and I

13  really didn't fight it off.  And so we were in an

14  embrace on the sofa and she freaks out and starts

15  kicking me.  So it kind of got physical so to speak.

16  No blows.  There were no fists or anything like that.

17  But I pushed her a little bit.

18          So she left at 5 a.m. and said -- I said

19  Carmen, please, from the bottom of my heart I'm

20  sorry.  Be happy for me.  I'm in a good relationship.

21  So she said, well, I'm going to ruin your life.  I

22  said please, go home.  God bless.  We can be friends

23  or whatever.

24          Well, she had another boyfriend and I

25  believe she went home to that boyfriend.  It was a

```
 1    Sunday morning.  So she went and stayed with her
 2    other boyfriend.  And he got very jealous.  The guy
 3    was always jealous of me.  I think he smacked her
 4    around a little bit and she went and talked to a
 5    friend and they said, oh, you know, Mark -- which I
 6    go by Mark or Allen -- he said he's got a good job.
 7    He does really good.  You should sue him.  The first
 8    thing you need to do is go to the hospital and say
 9    you were hit by him.  So about 48 hours after she
10    left my house she shows up in the hospital and said
11    that she was attacked and raped.  Granted, when you
12    do that in the hospital, that's a red flag.
13            She said she had been kidnapped and raped.
14    She said she was raped, sodomized, that I assaulted
15    her, that I assaulted her with a handgun which I did
16    not own.  It just went completely bad.  So --
17            MR. CRAIG:  That's the gist of the
18    allegations.
19        A.  That's the gist of the allegations.  But
20    there was no sex involved.
21            MR. CRAIG:  That's the gist.
22        A.  But she was a girlfriend.
23    BY MR. MEEKS:
24        Q.  At the time -- and this all occurred
25    obviously prior to March 2004; is that correct?
```

1       A.  It happened in April 6, 2003.

2       Q.  And you knew Ms. Colon at that point in

3   time?

4       A.  Yes.

5       Q.  How long had you known her at that point in

6   time?

7       A.  A couple of months.

8       Q.  You all met in early '03, late '02?

9       A.  Yes.

10      Q.  And when did you start living with Ms.

11  Colon?

12      A.  I only moved in with Ms. Colon after I got

13  out of prison.

14      Q.  So while you were in prison you all were in

15  a relationship?

16      A.  Yes, amazingly.

17      Q.  Ms. Colon had a power of attorney for you

18  while you were in prison; is that correct?

19      A.  That's correct.

20      Q.  Mr. Storch, the court reporter is going to

21  show you what we've marked as Exhibit 7.

22          (Exhibit #7 marked.)

23  BY MR. MEEKS:

24      Q.  Take a little bit of time and review that

25  for us.

1      A.   (Reviewing document).

2      Q.   Do you recognize this document?

3      A.   Vaguely.   I think I've read it, skimmed

4   over it one time before.

5      Q.   Do you agree that this is copy of your

6   indictment in Cobb County Superior Court?

7      A.   I couldn't testify to that.   I would have

8   to invoke the Fifth Amendment.

9      Q.   Do you agree that you are currently under

10   indictment in Cobb County Superior Court for criminal

11   charges?

12      A.   I assume that I'm still under indictment.

13      Q.   And these criminal charges stem from your

14   arrest in August of 2012?

15      A.   That's correct.

16      Q.   After your arrest in August 2012, did the

17   police advise you of the description of the charges

18   that you were being arrested for?

19      A.   I would have to invoke the Fifth Amendment

20   on that.

21      Q.   Did you speak with a prosecuting attorney

22   after you were arrested in August of 2012?

23      A.   No.

24      Q.   You had your own attorney; is that correct?

25      A.   Yes.

```
1          Q.  Did you speak with a judge or did a judge
2     speak to you about the charges that were against you?
3          A.  No, not that I'm aware.  Are you talking
4     about during an arraignment or at any point in time,
5     like the judge addressed me personally?
6          Q.  Yes.
7          A.  I don't remember.  I don't think so.
8          Q.  You were under probation at that time?
9          A.  Yes, sir.
10         Q.  And that was in connection with these
11    earlier charges that we spoke about?
12         A.  Yes, it is.
13         Q.  You had your probation revoked for your
14    arrest; is that correct -- or in connection with your
15    arrest?
16         A.  Yes.
17         Q.  Did you have a hearing or meeting with a
18    probation officer?
19         A.  No, I did not.
20         Q.  If you'll go back to what we marked as I
21    think it's Exhibit 6, if you could look on the page
22    beginning -- the page with the mark of MCC 901?
23         A.  Which exhibit?
24         Q.  That would be Exhibit 6.
25         A.  Yes.
```

1      Q.   Does this refresh your recollection with

2  regard to the revocation of your parole?

3      **A.   Probation.  I'm not on parole.**

4      Q.   I'm sorry.  Probation.

5      **A.   Yes, it looks vaguely familiar.**

6      Q.   So you agree that on August 11 -- is that

7  your signature on MCC 902, the second page?

8      **A.   It appears to be, with explanation.**

9      Q.   Okay.  Do you agree that as of the date of

10  this document, do you agree it appears to be August

11  11, 2012 or thereabouts?

12      **A.   I see the date.**

13      Q.   Actually it might be October 11, 2012.

14      **A.   Okay.**

15      Q.   That on or about that date you were aware

16  that you were being charged with felony offences

17  relating to the presence of the cameras at the salon

18  locations?

19      **A.   I made a reasonable assumption that's why I**

20  **was there.**

21      Q.   And this document indicates you were to

22  serve six months, that's correct?

23      **A.   Correct.**

24      Q.   But you only served three?

25      **A.   I was told that in county jail it's two for**

1    one.

2         Q.   Two for one?

3         A.   If you get a year, you do six months; if

4    you get six months, you do 90 days.

5         Q.   50 percent, okay.

6              Did you talk with Ms. Colon about your

7    arrest?

8         A.   I'll assert my Fifth.

9         Q.   Did she come to visit you while you were in

10   confinement?

11        A.   I'll assert my Fifth.

12        Q.   Where were you confined between August and

13   November?

14        A.   At the Cobb County Adult Detention Facility

15   Center.

16        Q.   Did you talk with Ms. Colon about any

17   police investigation with regard to the presence of

18   cameras at the salon locations?

19        A.   I'll invoke my Fifth --

20             MR. CRAIG:  At what time?

21   BY MR. MEEKS:

22        Q.   Prior to March 11, 2013.

23        A.   Can you repeat that question, please?

24        Q.   Let's break it down.  Prior to March 11,

25   2013, did you talk with Ms. Colon about any police

```
 1    investigation or search of either salon location?

 2         A.   2013?  March 2013, yes.  I had been in jail

 3    for it and we've had discussions, yes.

 4         Q.   Prior to November 2012 when you were

 5    released from Cobb County detention did you speak

 6    with Ms. Colon about any police search or

 7    investigation at either salon location?

 8         A.   Yes, we talked about it.

 9         Q.   Do you recall when you spoke with Ms.

10    Colon?

11         A.   No, I do not.

12         Q.   But it was sometime between your arrest in

13    August and your release in November?

14         A.   Yes.

15         Q.   So when you were in Cobb County detention

16    you were aware that the Loring Road location had been

17    searched by the police?

18         A.   I was aware, yes.

19         Q.   Were you aware that they had taken a

20    computer from the Loring Road location?

21         A.   Yes, I'm aware of that computer being

22    taken.  It controlled the security system.

23         Q.   Were you aware at the time that you were in

24    jail that they had taken that computer?

25         A.   I think so.
```

```
 1        Q.   And were you aware at the time you were in

 2   the Cobb County Detention Center that there were

 3   allegations that the computer contained images of

 4   women in undress?

 5        A.   No.   Still don't think that's true.

 6        Q.   I understand that you may contest whether

 7   it's true or not, but are you aware of the

 8   allegation?

 9        A.   No, I'm not aware of that computer having

10   any sort of images on it.

11        Q.   Are you aware while you were in the Cobb

12   County Detention Center that images of women at the

13   Loring Road location in various stages of undress had

14   been discovered?

15        A.   Plead the Fifth Amendment on that.

16        Q.   Mr. Storch, are you aware that it was

17   alleged that there were images of women in various

18   stages of undress at the Loring Road location that

19   were -- strike that.

20             While you were in the Cobb County Detention

21   Center were you aware of any allegations that you had

22   taken images or recordings of women in various stages

23   of undress while they were at the Loring Road

24   location, that it had been alleged?

25        A.   I was in jail for it.   Of course I'm aware
```

1   of it.

2       Q.   Were you aware that it had been -- that it

3   had been alleged that you had taken images or

4   recordings of women in various stages of undress at

5   the Sandy Plains location?

6       **A.   I thought that was kind of vague, so I**

7   **would have to say no.**

8       Q.   While you were in the Cobb County Detention

9   Center were you aware that it was alleged that you

10  had recorded or videotaped women in various stages of

11  undress while they were at the Sandy Plains Road

12  location?

13      **A.   No, not when I was in county jail, if**

14  **that's what you're getting at.**

15          MR. MEEKS:   I think that's about all that I

16  have, Mr. Storch.   I'll pass off to these other

17  gentlemen.

18          MR. YATES:   I don't have anything.

19          (Signature waived.)

20          (Deposition concluded at 12:15 p.m.)

21

22

23

24

25

```
 1                        CERTIFICATE

 2   STATE OF GEORGIA:

 3   COUNTY OF FULTON:

 4           I hereby certify that the foregoing

 5   transcript was taken down, as stated in the caption,

 6   and the colloquies, questions and answers were

 7   reduced to typewriting under my direction; that the

 8   transcript is a true and correct record of the

 9   evidence given upon said proceeding.

10           I further certify that I am not a relative

11   or employee or attorney of any party, nor am I

12   financially interested in the outcome of this action.

13           This the 28th day of May 2014.

14

15

16

17

18

19           Lucy C. Rateau, RPR, CCR 2766

20

21

22

23

24

25
```

```
 1

 2                        D I S C L O S U R E

 3

 4

 5      Pursuant to Article 10(b) of the Rules and Regulations

 6      of the Georgia Board of Court Reporting, Tiffany Alley

 7      Global Reporting & Video makes the following disclosure:

 8

 9      The reporter for this proceeding is not disqualified

10      for a relationship of interest under the provisions of

11      OCGA 9-11-28(c).  The reporter for this proceeding is

12      a Georgia Certified Reporter, here as a representative

13      of Tiffany Alley Global Reporting & Video to report

14      this matter.

15

16      Tiffany Alley Global Reporting & Video is not taking this

17      deposition under any contract that is prohibited by

18      OCGA 15-14-37(a)and(b).

19

20

21

22

23

24

25
```