IN THE UNITED STATES DISTRICT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


MARYLAND CASUALTY COMPANY,

                    Plaintiff,

  vs.                                    CASE # 1:13-cv-3056-TWT

SALON AVENUE SUITE 2;
SALON AVENUE SUITES, INC.;
MARK ALLEN STORCH; JULIETTE
COLON; ELIZABETH B. BARRON;
KARI BENEDICT; HEATHER BOWEN;
NANCY CLARK; DONNA McRAE;
KATHERINE MILLER; MARY ROE and
JANE DOE,

                    Defendants.


DEPOSITION of JULIETTE COLON - 30(b)(6) and Individually

                May 22, 2014 - 10:00 a.m.

              Swift Currie McGhee & Hiers, LLP

                The Peachtree, Suite 300

                1355 Peachtree Street, NE

                  Atlanta, GA  30309

                Lucy C. Rateau, CCR, RPR

```
 1                 INDEX OF EXHIBITS

 2    Exhibit           Description                    Page

 3        #8       Letter dated 7/29/12 from              31

 4                 Juliette Colon to tenants at

 5                 Salon Avenue Suites

 6        #9       Lease Termination and Release          36

 7                 Agreement

 8

 9

10

11     INDEX TO EXAMINATIONS              PAGE

12   By Mr. Meeks                                         7

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiff:

 3         CHRISTOPHER C. MEEKS, ESQ.

 4         SETH FRIEDMAN, ESQ.

 5         Weissman Nowack Curry & Wilco

 6         One Alliance Center, 4th Floor

 7         3500 Lenox Road

 8         Atlanta, GA  30326

 9         404.926.4500

10         sethf@wncwlaw.com

11

12    On behalf of the Defendants Salon Avenue 2; Salon

13    Avenue Suites, Inc.; Mark Allen Storch; Juliette

14    Colon:

15         J. BLAIR CRAIG, ESQ.

16         Wood & Craig, LLC

17         197 14th Street, NW

18         Suite 200

19         Atlanta, GA  30318

20         404.888.9962

21         blair@woodcraig.com

22    - and -

23         DANIEL J. KINGSLEY, ESQ.

24         Swift Currie McGhee & Hiers, LLP

25         The Peachtree, Suite 300
```

1          1355 Peachtree Street, NE

2          Atlanta, GA   303090

3          404.888.6172

4          dan.kingsley@swiftcurrie.com

5

6    On behalf of the Defendants Elizabeth B. Barron, Kari

7    Benedict, Heather Bowen, Nancy Clark, Donna McRae and

8    Katherine Miller:

9          TODD YATES, ESQ.

10          Kaufman Law

11          100 Galleria Parkway, SE

12          Suite 1100

13          Atlanta, GA   30339

14          404.355.4000

15          tmy@kaufmanlaw.net

16

17    On behalf of the Defendant Jane Doe:

18          E. BRIAN WATKINS, ESQ.

19          E. Brian Watkins, PC

20          3350 Peachtree Road, Suite 1225

21          Atlanta, GA   30326

22

23    On behalf of DLC and Sprayberry:

24          ZACHARY M. WILSON, III

25          Hawkins Parnell Thackston & Young, LLP

```
 1          4000 Sun Trust Plaza

 2          303 Peachtree Street, NE

 3          Atlanta, GA  30308

 4          404.614.7432

 5          zwilson@hptylaw.com

 6

 7

 8

 9

10

11          (Pursuant to Article 10(B) of the Rules and

12     Regulations of the Georgia Board of Court Reporting,

13     a written disclosure statement was submitted by the

14     court reporter to all counsel present at the

15     proceeding.)

16

17

18

19

20

21

22

23

24

25
```

1           MR. CRAIG:  We have the marital spousal

2    privilege.  So we can say it one time, is that all

3    right, to just say privilege?

4           MR. FRIEDMAN:  I understand.  We don't

5    necessarily agree with it.  And if we decide we need

6    to raise that issue and force testimony, we may

7    decide that, depending on what the questions are,

8    because I think there are exceptions to that.

9           MR. CRAIG:  What are the exceptions?

10          MR. FRIEDMAN:  For areas where it wouldn't

11   matter that they're married, like if she saw him do

12   something, you know, that is not related to the

13   intimate areas of a man and wife, that kind of thing.

14   There are some exceptions.

15          MR. CRAIG:  I think that's an unclear area

16   whether an action is the same thing as conversation.

17          MR. FRIEDMAN:  I understand.  We're just

18   going to reserve the right to challenge that.  I

19   understand she's going to assert it, and that she's

20   not going to -- it's your understanding you're going

21   to instruct her not to answer if she asserts that

22   privilege; is that correct, Blair?

23          MR. CRAIG:  Yes.

24          MR. FRIEDMAN:  We reserve the right to

25   decide to if we're going to file a motion to compel

1    on that, that's all.

2            MR. CRAIG:  Okay.

3            MR. KINGSLEY:  We're only taking this

4    deposition for the coverage action?

5            MR. MEEKS:  Yes, that's my understanding,

6    just like last time.

7                      JULIETTE COLON

8    having been first duly sworn, was examined and

9    testified as follows:

10                     EXAMINATION

11   BY MR. MEEKS:

12       Q.  Ms. Colon, we met earlier.  My name is

13   Chris Meeks, and prior to a couple of minutes ago we

14   had not met before; is that correct?

15       **A.  Correct.**

16           MR. MEEKS:  We'll be taking this deposition

17   in the action styled Maryland Casualty Company versus

18   Salon Avenue Suite 2, et al.  And this deposition is

19   taken pursuant to Notice, agreement of notice,

20   Federal Rules of Civil Procedure.

21           Gentlemen, we're going to reserve all

22   objections except to the marital privilege that you

23   discussed earlier; is that correct, Blair?

24           MR. CRAIG:  Yes.

25           MR. MEEKS:  So all objections except to the

1    form of the question, marital privilege and

2    responsiveness of the answer.  Is that acceptable?

3         MR. CRAIG:  Sure.

4         MR. MEEKS:  And you're going to reserve --

5         MR. CRAIG:  We're going to read and sign.

6    BY MR. MEEKS:

7         Q.  Ms. Colon, I'm going to ask you a series of

8    questions related to the case.  If you don't hear a

9    question that I ask, please say so and I'll repeat it

10   or have the court reporter repeat it.

11        Likewise, if you don't understand a

12   question, please ask me to rephrase and I'll do my

13   best to rephrase it in a way that is easier to

14   understand.  If you don't tell me that you don't hear

15   or don't understand a question, I'll assume that you

16   do and that your answer is responsive.  Do you

17   understand?

18        A.  Yes.

19        Q.  Since the court reporter is transcribing

20   the deposition it's important that we have verbal

21   responses, no uh-huhs, huh-uhs, head nods, that sort

22   of thing.  If the response is yes or no, we just ask

23   that you give a verbal response.  Do you understand?

24        A.  Yes.

25        Q.  As I'm asking questions please try not to

1    interrupt me and, likewise, I'll try not to interrupt

2    you as you're giving answers.  And if I do interrupt

3    you, please ask me to stop and complete your answer.

4          Feel free to take breaks as you need to;

5    however, if we do have a question pending I ask that

6    you answer the question before we take the break.

7          Have you ever given a deposition before?

8    A.  No.

9    Q.  And you're aware that this deposition is

10   going to be given under oath.  Even though we're not

11   in a courtroom, it's the same sort of thing, that

12   your answers are supposed to be truthful.

13   A.  Yes.

14   Q.  Ms. Colon, have you taken any medication or

15   are you under the influence of any substances that

16   would affect your ability to testify today?

17   A.  No.

18   Q.  And can you think of any reason why you

19   cannot answer any of the questions that I'm about to

20   ask truthfully and completely?

21   A.  No.

22   Q.  If you could flip in this notebook that has

23   the exhibits from the prior deposition in it, flip to

24   tab one.  And that is what was marked as Exhibit 1 in

25   Mr. Storch's deposition.  It's the Notice of

1    Deposition for Salon Avenue Suites, Incorporated.

2         Are you aware that you've been designated

3    as a corporate representative on the topics listed in

4    this deposition notice?  And you can read through

5    that, if you would like to, before you answer.

6         MR. CRAIG:  Well, I'm not sure that that's

7    a correct statement.  What I said was, if you want to

8    ask her questions she may have some knowledge that

9    Mr. Storch didn't have and vice versa.  And since

10   you're taking both at the same time, you're taking

11   hers as a corporate representative and individually,

12   she may have knowledge about some of these and some

13   of these she does not.

14        MR. MEEKS:  Sure.  Can we highlight those

15   at the moment, which ones that she's prepared to

16   testify to?

17        MR. CRAIG:  No.  I don't see the reason for

18   that.  Just go through and ask.

19   BY MR. MEEKS:

20        Q.  As we just went over, you're aware that

21   your deposition is being taken in your individual

22   capacity?

23        **A.  Yes.**

24        Q.  Ms. Colon, can you please state your full

25   name and address for the record?

1        A.   Juliette Proenza Colon, 2925 Carolyn

2   Street, Marietta, Georgia, 30062.

3        Q.   And, Ms. Colon, what is your educational

4   background going from high school forward?

5        A.   I have a Bachelor's degree in

6   Communications.

7        Q.   Where did you obtain the Bachelor's degree?

8        A.   Georgia State.

9        Q.   And where did you go to high school?

10        A.   Southwest DeKalb.

11        Q.   And who is your current employer?

12        A.   Servcorp.

13        Q.   And your previous employer?

14        A.   Carr Workplaces.

15        Q.   And what do you mean by Carr Workplaces?

16        A.   That was the name of the company.

17        Q.   Was that a garage or --

18        A.   I'm in the executive suites business.  Carr

19   Workplaces is the executive suites business and

20   Servcorp is executive suites.

21        Q.   What do you mean by the executive suites

22   business?

23        A.   It's an industry that's been around for

24   over 50 years.  We provide temporary, up to 12 months

25   office space for individuals for businesses.

1        Q.   Ms. Colon, what's your marital status?

2        **A.   Married.**

3        Q.   And you're married to Mark Storch, correct?

4        **A.   Yes.**

5        Q.   When were you and Mr. Storch married?

6        **A.   3/6/09.**

7        Q.   March 6, 2009?

8        **A.   Yes.**

9        Q.   When did you meet Mr. Storch?

10       **A.   February 15, 2001.**

11       Q.   And so you're aware that Mr. Storch is a

12       convicted felon; is that correct?

13       **A.   Yes.   I was aware very early on.**

14       Q.   When did you become aware?

15       **A.   When he told me.**

16       Q.   And when did he tell you?

17       **A.   Within a couple of months of dating.**

18       Q.   So at the time that you all met he was a

19       convicted felon?

20       **A.   Yes.**

21       Q.   And you're aware that Mr. Storch is

22       currently on probation for charges of aggravated

23       assault with attempt to rape and possession of

24       cocaine?

25       **A.   Yes.**

1      Q.  And you're aware that he served time in

2   prison for those charges?

3      **A.  Yes.**

4      Q.  Mr. Storch was convicted of those charges

5   on or about March of 2004; is that correct?

6      **A.  No, it was May.**

7      Q.  May of 2004.  Mr. Storch served time in

8   prison from May of 2004 until December of 2008; is

9   that correct?

10     **A.  That's correct.**

11     Q.  Did Mr. Storch move in with you -- had he

12  lived with you prior to his conviction?

13     **A.  Yes.**

14     Q.  How long had he lived with you?

15     **A.  A year.**

16     Q.  Did he live with you after he was released

17  from prison?

18     **A.  Yes.**

19     Q.  Did he live with you at the address that

20  you just gave us?

21     **A.  Yes.**

22     Q.  You're aware that Mr. Storch is a

23  registered sex offender?

24     **A.  Yes.**

25     Q.  When did you first know that he was a

1    registered sex offender?

2         A.   **Right before he was about to be released.**

3         Q.   You and Mr. Storch operated two salon

4    locations; is that correct?

5         A.   **No.  He operated them.**

6         Q.   Mr. Storch operated the salon locations?

7         A.   **Yes.**

8         Q.   Did you have any involvement in their

9    management or the operations?

10        A.   **No.**

11        Q.   Were you aware of the business concept that

12   he was following?

13        A.   **I gave him the idea.**

14        Q.   And what was that idea?

15        A.   **It's the same model as executive suites**

16   **where you rent private offices or suites on a**

17   **temporary basis.**

18        Q.   So, for instance, in this case the salon

19   locations were renting space to hair stylists --

20        A.   **Beauty professionals.**

21        Q.   Beauty professionals, and they could

22   conduct their business there?

23        A.   **Yes.**

24        Q.   But these beauty professionals weren't

25   employees of the location?

```
1          A.   No.

2          Q.   They operated their own businesses through

3     --

4          A.   Yes.

5          Q.   One of these locations was located at 2550

6     Sandy Plains Road in Marietta; is that correct?

7          A.   Yes.

8          Q.   And the other was located at 3102 Loring

9     Road in Kennesaw; is that correct?

10         A.   Yes.

11         Q.   When did Mr. Storch begin this business?

12         A.   I can't recall the exact date that he

13    decided to start working on it.

14         Q.   Was it after he was released from prison?

15         A.   Yes.  He was looking for different things

16    to do.  Yes.

17         Q.   Was it after you all were married?

18         A.   Yes.

19         Q.   How long after?

20         A.   Probably a few months.

21         Q.   Mr. Storch -- how often did he work at the

22    locations?

23         A.   Every day.

24         Q.   If you can flip to what's under tab two.

25    And that's what was marked as Exhibit 2 in Mr.
```

1     Storch's deposition.  Have you ever seen one of Mr.

2     Storch's business cards?

3          **A.  Yes.**

4          Q.  And do you recognize this as one of his

5     business cards for the Salon Avenue locations?

6          **A.  Yes.**

7          Q.  The title that's listed there VP of

8     Operations, is that accurate?

9          **A.  That was the title he put on his card.**

10          Q.  It says vice president.  Who was the

11     president of operations or the president at the

12     locations, do you know?

13          **A.  I was the president of the corporation.**

14          Q.  You were the president of the corporation.

15     What was your role as president of the corporation?

16          **A.  I had no role.**

17          Q.  Did you have an ownership interest in the

18     corporation?

19          **A.  Not at the time, no.**

20          Q.  Did you ever acquire an ownership interest

21     in the corporation?

22          **A.  Yes.**

23          Q.  When about?

24          **A.  October 2011.**

25          Q.  Did you have any supervisory authority over

1      Mr. Storch?

2          A.   No.

3          Q.   You couldn't tell him what to do in

4    connection with the business or anything like that?

5          A.   No.

6          Q.   Mr. Storch executed the leases or the

7    rental agreements with the individual tenants; is

8    that correct?

9          A.   Yes, that's correct.

10         Q.   Mr. Storch had the ability to access the

11   locations, the Sandy Plains and the Loring Road

12   locations?

13         A.   Yes.

14         Q.   Did you as well?

15         A.   I never went there.

16         Q.   Mr. Storch had the ability to access the

17   suites at each location; is that correct?

18         A.   Yes.

19         Q.   And did Mr. Storch perform -- did he have

20   access to the interior of the locations to perform

21   maintenance, do that sort of thing?

22         A.   Yes.

23         Q.   Were you aware that Mr. Storch installed

24   surveillance cameras at the salon locations?

25              (Off-the-record discussion between the

1    witness and Mr. Craig).

2         A.  No.

3    BY MR. MEEKS:

4         Q.  Were you ever aware that there were cameras

5    installed at the salon locations?

6              (Off-the-record discussion between the

7    witness and Mr. Craig).

8         A.  Later.

9    BY MR. MEEKS:

10        Q.  When later?

11        A.  When the police got involved.

12        Q.  When did the police get involved?

13        A.  When they were called.

14        Q.  Can you give me a date, a time to the best

15   of your recollection?

16        A.  July 28, 2012.

17        Q.  So who told you about the cameras on July

18   28, 2012?

19        A.  He called me and said the police were

20   there.

21        Q.  And by "he" you mean Mr. Storch?

22        A.  Yes.

23        Q.  And what did you learn about the

24   installation of the cameras after July 28 of 2012?

25             MR. CRAIG:  Hold on a second.  If you're

 1    asking what she learned from someone other than her

 2    spouse, I'll allow that question.  But as far as

 3    otherwise we're going to assert the marital

 4    privilege.

 5    BY MR. MEEKS:

 6         Q.  Other than Mr. Storch, what did you learn

 7    about the cameras at the salon locations?

 8         **A.  The police said that they suspected he put**

 9    **cameras there.**

10         Q.  Did you talk with anybody else other than

11    the police about the cameras?

12         **A.  No.**

13         Q.  Did you talk with Mr. Storch about the

14    cameras?

15              MR. MEEKS:  I think the fact that they had

16    a conversation is different than the contents of it.

17              MR. CRAIG:  Okay.

18         **A.  Yes.**

19    BY MR. MEEKS:

20         Q.  Were you aware of any complaints or

21    suspicions of any crimes being committed at the salon

22    locations?

23         **A.  Yes.**

24         Q.  What specifically in terms of complaints or

25    suspicions?

1              (Off-the-record discussion between the

2      witness and Mr. Craig).

3              MR. CRAIG:  We're going to assert the

4      marital privilege.

5      BY MR. MEEKS:

6         Q.  Did you ever contact the police about any

7      of those complaints?

8         **A.  No.**

9         Q.  Did you ever witness anything that you

10     personally thought was suspicious at either one of

11     the locations?

12        **A.  I wasn't there, so no.**

13        Q.  Ms. Colon, let's talk about July 28th.  And

14     if you can turn to the tab that's marked three.  This

15     was previously marked in Mr. Storch's deposition as

16     Exhibit 3.  And I'll ask you have you ever seen that

17     document before?

18        **A.  Never.**

19        Q.  Take a couple of minutes.  And I believe

20     the date there is July 27.

21        **A.  Well, I'm mistaken then.**

22        Q.  July 27, does that sound correct?

23        **A.  That was a blur to me.**

24        Q.  Sure.  I understand.  Was Mr. Storch

25     arrested on July 27?

1        A.  No.

2        Q.  He was not.  Where were you on July 27?

3        A.  **Working from home.**

4        Q.  And do you know where Mr. Storch was that

5   day?

6        A.  **No.  I never kept tabs on him.**

7        Q.  But there was a point in time on July 27

8   when he was at the Sandy Plains Road location; is

9   that correct?

10        A.  **It would appear to be.**

11        Q.  And you said Mr. Storch called you?

12        A.  **Yes.**

13        Q.  And what do you understand happened at the

14   Sandy Plains Road location on July 27?

15        MR. CRAIG:  Again, Chris, any communication

16   or any understanding that she gained from her husband

17   we're going to assert the marital privilege.  If

18   you're asking what her understanding was from some

19   third party, such as the police --

20        MR. MEEKS:  Sure, the police for one.

21        A.  **Can you ask the question again?**

22        MR. CRAIG:  Other than her spouse.

23   BY MR. MEEKS:

24        Q.  In connection with what happened on July

25   27th, did you speak with any members of the police

1    force?

2        A.   Yes.

3        Q.   Do you recall their names?

4        A.   Not really.

5        Q.   Do you know how many you talked to?

6        A.   There were several big, big guys.

7        Q.   Were they uniformed officers?

8        A.   Yes.

9        Q.   Any plain-clothed detectives?

10       A.   I can't remember.  They weren't very nice.

11       Q.   And did they ask you questions?

12       A.   No.

13       Q.   Did they --

14       A.   They just said ugly things, that's all.

15       Q.   What sort of ugly things did they say?

16           MR. CRAIG:  You can answer that.  May I

17   just have a continuing objection to any hearsay?

18           MR. MEEKS:  Sure.

19       A.   I honestly don't remember everything they

20   said.  It was very condescending, just kind of a mean

21   attitude towards me.

22       Q.   What was your understanding of what had

23   happened at the Sandy Plains location after you spoke

24   with the police?

25       A.   They were accusing him.

```
 1        Q.   Accusing him of what?

 2        A.   Invasion of privacy.

 3        Q.   Do you understand the circumstances of that

 4   were the presence of cameras at the Sandy Plains

 5   location?

 6        A.   Supposedly.

 7        Q.   Did you ever speak with any of the tenants

 8   at the Sandy Plains location about what happened on

 9   July 27?

10        A.   Later.

11        Q.   Which tenants?

12        A.   Every one of them.

13        Q.   Do you recognize the name    Mary Roe

14        A.   Yes.

15        Q.   Did you speak with Ms. Mary Roe

16        A.   Yes.

17        Q.   And do you understand that Ms. Mary Roe is

18   claiming that she found a camera above her suite?

19        A.   I understand that's what she's claiming.

20        Q.   Ms. Mary Roe operated a Brazilian wax

21   studio; is that correct?

22        A.   I guess.

23        Q.   Do you recognize the name    Jane Doe

24        A.   Yes.

25        Q.   How do you recognize her name?
```

1       A.   I knew she was one of the clients.

2       Q.   Did Ms. Jane Doe also rent space from

3   either one of the locations?

4       A.   My understanding was she did but she did

5   not at the time.

6       Q.   Is it your understanding that Ms. Jane Doe

7   was present in Ms. Mary Roe suite when the camera

8   was --

9       A.   No, I didn't know that.

10       Q.   So you did speak with Ms. Mary Roe about

11   July 27th?

12       A.   All I said was that she could get out of

13   her lease.

14       Q.   So you told her that she could break her

15   lease?

16       A.   Absolutely.  I let everybody in that center

17   move out -- except the five that chose to stay.

18       Q.   And when did you have that conversation

19   with the tenants?

20       A.   Probably a week or two later.

21       Q.   So later in July or early August?

22       A.   Probably.

23       Q.   And had Mr. Storch been arrested by that

24   point in time?

25       A.   Yes.

```
 1          Q.   When was Mr. Storch arrested?

 2          A.   Well, I'm going to be fudging on the dates.

 3     I guess August 10th or something like that.

 4          Q.   Do you recall the circumstances?   Were you

 5     present whenever he was arrested?

 6          A.   Yes, I was.

 7          Q.   Where was he arrested?

 8          A.   At our home.

 9          Q.   Do you recall the approximate time?

10          A.   11:30 at night.

11          Q.   Did you speak with any of the police

12     officers at the time that he was arrested?

13          A.   Yes.

14          Q.   And what did you do after he was arrested?

15          A.   Tried to go to sleep.

16          Q.   Was there any sort of bail or bond hearing

17     for him after he was arrested?

18          A.   That was a Saturday morning.  So I mean I

19     didn't -- we didn't know what was going on for

20     several days.

21          Q.   When was the next time you saw Mr. Storch

22     after he was arrested?

23          A.   Probably October.

24          Q.   October?

25          A.   Or November.
```

```
 1        Q.  Was he still in prison when you saw him

 2   again?

 3        A.  Yes.

 4        Q.  So you saw him while he was in prison?

 5        A.  One time.

 6        Q.  When was Mr. Storch released from prison?

 7        A.  Middle of November.

 8        Q.  And let's go back to July 27th.  What sort

 9   of vehicle did Mr. Storch drive at the time, July

10   2012?

11        A.  A black Porsche SUV.

12        Q.  It ws a Cayenne; is that correct?

13        A.  Yes.

14        Q.  Was Mr. Storch's vehicle impounded?

15        A.  Yes.

16        Q.  And do you recall the date it was

17   impounded?

18        A.  That same day.

19        Q.  So on July 27 you went and had to drive Mr.

20   Storch home basically?

21        A.  Yes.

22        Q.  You're aware that after Mr. Storch was

23   arrested that a portion of his probation was revoked?

24        A.  Yes.

25        Q.  And was that part of the three months that
```

1     he spent in jail to the best of your recollection?

2          A.   Yes.

3          Q.   Did the police execute a search warrant on

4     your home?

5          A.   Yes.

6          Q.   When did they execute that search warrant?

7          A.   That night, the 27th.

8          Q.   So he was arrested and the search warrant

9     occurred all at the same time?

10         A.   No.

11         Q.   I'm sorry.  When did they execute the

12    search warrant?

13         A.   The 27th.

14         Q.   Were you present at your home?

15         A.   Yes.  It was the middle of the night.

16         Q.   So they searched in the middle of the night

17    of the 27th?

18         A.   About midnight.

19         Q.   Did they remove any items from your home?

20         A.   They took every phone, every computer,

21    every Kindle, every iPad, everything.

22         Q.   Basically anything that was computerized?

23         A.   Everything.

24         Q.   Are you aware of --

25         A.   Even my children's.

1        Q.   How many children do you have, by the way?

2        A.   Two.

3        Q.   Their approximate ages?

4        A.   Now, 19 and 21.

5        Q.   So two years ago they would have been 17

6    and 19 approximately?

7        A.   Yes.

8        Q.   Are you aware that there was a search

9    warrant executed on the Loring Road location?

10       A.   Not until later.

11       Q.   When later?

12       A.   Probably the next day.

13       Q.   So July 28th --

14       A.   No, no, that was after he was arrested.

15       Q.   So the police searched the Loring Road

16   location sometime after August 10?

17       A.   Uh-huh (affirmative).

18       Q.   Somewhere around that weekend following

19   August 10 or thereabouts?

20       A.   Yes.

21       Q.   Do you know if anything was removed from

22   the Loring Road location?

23       A.   Yes.

24       Q.   What do you recall --

25       A.   A security computer.

1          Q.   A security computer?

2          A.   **It managed the security system, letting**

3    **people in and out.**

4          Q.   Were there any cameras removed?

5          A.   **I don't think so.  I don't know.**

6          Q.   Any documents, anything like that?

7          A.   **I don't know.**

8          Q.   Do you know if they removed anything from

9    the Sandy Plains location, the police I mean?

10         A.   **I don't know.**

11         Q.   Ms. Colon, if you can flip to tab five.

12   I'll just ask you if you recognize this document?

13         A.   **Yes.**

14         Q.   How do you recognize it?

15         A.   **It's an agreement.**

16              MR. CRAIG:  I'm sorry.  You said five?

17   It's the incident investigation?

18              MR. MEEKS:  Yes.

19         A.   **No, I've never seen this.**

20   BY MR. MEEKS:

21         Q.   Do you recognize -- if you can look in the

22   middle of the page for me -- the name Myriam

23   Alvarado?  Do you recognize that name?

24         A.   **No.  I don't know who that is.**

25         Q.   This address 5062 Womack Avenue, does that

```
 1    mean anything to you?

 2         A.   I've never seen or heard her name before.

 3         Q.   At the top right corner, the date there

 4    August 10, does that match up with your recollection

 5    of when Mr. Storch was arrested?

 6         A.   Yes.

 7         Q.   Ms. Colon, do you recognize the name of

 8    Heather Bowen?

 9         A.   Yes.

10         Q.   And was Heather Bowen one of the tenants at

11    one of the locations?

12         A.   Yes.

13         Q.   Which location, do you recall?

14         A.   Acworth.

15         Q.   And that's on Loring Road, correct?

16         A.   Uh-huh (affirmative).

17         Q.   Yes?

18         A.   Yes.

19         Q.   Are you aware that Ms. Bowen has alleged

20    that there was a camera above her suite?

21         A.   No, I was not aware of that.

22         Q.   You're not aware that she alleged that?

23         A.   No, I was not.  She never mentioned it to

24    me.

25         Q.   And while we're at it, let's look at what's
```

1    under tab number four that's previously marked as

2    Exhibit 4 in Mr. Storch's deposition.  And I think

3    you mentioned that you recognize that document

4    earlier?

5         A.   Yes.  That's an agreement.

6         Q.   How do you recognize this agreement?

7         A.   Because I saw it.

8         Q.   When did you see it?

9         A.   After all this happened.

10        Q.   And after all this happened, you mean after

11   Mr. Storch was arrested?

12        A.   After July 27.

13        Q.   After July 27 did you assume any managerial

14   role for the companies?

15        A.   Not until he was arrested.

16        Q.   So after he was arrested you began running

17   the salon locations?

18        A.   Yes.

19        Q.   And did you review the leases?

20        A.   Yes.

21        Q.   Did you review any other documentation?

22        A.   Like what?

23        Q.   Service contracts and that sort of thing?

24        A.   No.  No.  I was barely hanging on.

25             (Exhibit #8 marked.)

```
 1     BY MR. MEEKS:

 2          Q.   I'm going to hand to you what the court

 3     reporter is going to mark as Exhibit 8.

 4               Ms. Colon, just take a minute to review

 5     that and I'll ask you do you recognize this document?

 6          A.   Yes.  I wrote it.

 7          Q.   And that's your signature on the bottom?

 8          A.   Yes.

 9          Q.   And this document is dated July 29?

10          A.   Yes.

11          Q.   Your first sentence references Friday's

12     events.  What were you referring to by Friday's

13     events?

14          A.   I don't understand the question.

15          Q.   In the first sentence it says, at the end

16     of the line --

17          A.   Well, just the police and everything.

18          Q.   So the police coming to the Sandy Plains

19     location?

20          A.   Yes.

21          Q.   And the tenants at the Loring Road location

22     and the Sandy Plains location were both aware of what

23     had happened at the Sandy Plains location?

24          A.   Yes.

25          Q.   And in the second paragraph there is a
```

1    mention of a new team member.  What's that referring

2    to?

3          A.  Well, I wasn't going to run the business.

4    I have my own big job.  And it wasn't prudent for him

5    to go back there, so he hired someone to run the

6    place.

7          Q.  Who did he hire?

8          A.  I don't remember her name.

9          Q.  Did you interact with her after Mr. Storch

10   was arrested?

11         A.  No.

12         Q.  Is she still there?

13         A.  No.  She didn't last a day.

14         Q.  But the new team member refers to --

15         A.  That person, that girl.

16         Q.  -- replacing Mr. Storch?

17         A.  Yes.

18         Q.  And how long did it take to find a new team

19   member?

20         A.  What happened then was I believe he had the

21   cleaning people come every other day, because we just

22   didn't have anybody running it.

23         Q.  So the only people that were at the

24   locations were the tenants?

25         A.  Yes.

1      Q.   And how did you all, during that period of

2   time, collect rent?

3      **A.   They put checks in the box or it was**

4   **automatic.**

5      Q.   So there was nobody running a reception

6   desk or anything like that?

7      **A.   Never.**

8      Q.   Did you have tenants call you in response

9   to this letter?

10     **A.   I don't recall.**

11     Q.   Did you ever receive any e-mails in

12   response from any of the tenants?

13     **A.   Yeah.   People that were concerned, yes.**

14     Q.   How many?

15     **A.   I don't know.   Again, it was a blur.**

16     Q.   Did any of the tenants ever threaten that

17   they were going to sue anybody?

18     **A.   Never.**

19     Q.   And this letter, was this the first time

20   you had signed anything on Salon Avenue Suites

21   letterhead?

22     **A.   Yes.**

23     Q.   Ms. Colon, after you had the conversation

24   with the police in July of 2012, did you have any

25   fear or apprehension that Mr. Storch could be charged

```
 1    with a crime?

 2         A.   Sure.

 3         Q.   Did you have any understanding what that

 4    charge might be?

 5         A.   Not really.  I mean I wasn't sure.

 6         Q.   Did you understand that it might be related

 7    to the presence of the cameras?

 8         A.   Yes.

 9         Q.   You testified earlier that you spoke with

10    Ms. Mary Roe is that correct?

11         A.   Uh-huh (affirmative).

12         Q.   You had not spoken with her prior to

13    Mr. Storch being arrested?

14         A.   Never -- I mean I don't know the timing,

15    honestly I don't know, but I told her she could move

16    out.

17         Q.   When did you tell her she could move out?

18         A.   I don't even know.

19         Q.   Was it --

20         A.   I don't know.

21         Q.   Did you tell Ms. Mary Roe that she could

22    move out or did Ms. Mary Roe request that she leave?

23         A.   I believe I told her she could move.

24         Q.   Did Ms. Mary Roe remove any of her

25    belongings from the salon location prior to that
```

1    conversation?

2        A.   I have no idea.

3        Q.   And I'll hand you what I'll mark as Exhibit

4    9.

5            (Exhibit #9 marked.)

6    BY MR. MEEKS:

7        Q.   And, Ms. Colon, I'll ask you do you

8    recognize this document?

9        A.   I guess.  I don't really remember it per

10   se.

11       Q.   Do you recall sending this document to Ms.

12   Mary Roe

13       A.   I knew I sent her something to terminate,

14   but I don't remember it being this detailed.

15       Q.   If you could turn with me to the second

16   page, page two of three at the bottom there, and the

17   sixth paragraph.  Do you recognize that?

18       A.   I certainly didn't write it.

19       Q.   Did you hire an attorney to write it?

20       A.   I did not.

21       Q.   Do you recall where you obtained this

22   document?

23       A.   No.

24       Q.   So you told Ms. Mary Roe that she could

25   break her lease?

1       A.   Uh-huh (affirmative).

2       Q.   Did you want anything in exchange from Ms.

3    Mary Roe

4       A.   I would want everything in writing.

5       Q.   And are you aware that Ms. Mary Roe

6    retained an attorney?

7       A.   Not until much later.

8       Q.   And when much later?  Do you recall?

9       A.   I honestly don't remember.

10       Q.   If you could flip with me in the notebook

11    in front of you to what's under tab six.  And I'll

12    ask you if you recognize that document -- and I'll

13    note that there are some redacted areas to protect

14    the privacy of some of the parties in the underlying

15    lawsuits.

16       A.   I do not recognize this.

17       Q.   Were you aware that there was insurance for

18    the salon locations?

19       A.   I imagined there was, but I didn't know per

20    se.  I didn't know anything about who or what.

21       Q.   Did you ever speak with anybody at the

22    Dickerson Agency?

23       A.   Never.

24       Q.   Were you aware that the Dickerson Agency

25    had anything to do with insurance on either salon

```
 1   location?

 2        A.   No.

 3        Q.   So if you can turn with me a little bit

 4   further in that document to the page that begins --

 5   and there are some numbers on the bottom right-hand

 6   corner, MCC890.

 7             You're aware that a woman identified as

 8   Jane Doe sued you and Mr. Colon, Salon Avenue Suites

 9   and --

10        A.   Sued who?

11        Q.   Sued you.

12        A.   Oh, I thought you said something else.

13   Yes.

14        Q.   And do you recall when you received service

15   of this complaint?

16        A.   Sometime in May.

17        Q.   May of 2013?

18        A.   I think so.

19        Q.   Do you know if Mr. Colon -- I'm sorry --

20        A.   That's what you had said.

21        Q.   Sorry.  Do you know if Mr. Storch received

22   service of the complaint?

23        A.   Yeah, I guess.  I wasn't home.

24        Q.   Do you recall the process server coming by

25   to your house or meeting up with you personally?
```

```
 1        A.  Yeah, I guess.  My son might have taken it.
 2   I honestly don't remember.
 3        Q.  Do you recall that a copy of the complaint
 4   was received before March of 2013?
 5        A.  No.
 6        Q.  So the first time that you were aware of
 7   the lawsuit was in May?
 8        A.  When we got served, yes.  I had no reason
 9   to believe --
10            MR. CRAIG:  You answered.
11   BY MR. MEEKS:
12        Q.  Did you ever provide Maryland Casualty
13   Company with notice of Mr. Storch's arrest?
14        A.  No.
15        Q.  Did you ever provide Maryland Casualty
16   Company with notice of any search warrants being
17   executed at your home or at any of the salon
18   locations?
19        A.  No.
20        Q.  Did you ever advise Maryland Casualty
21   Company of the events of July 27?
22        A.  No.
23        Q.  Did you ever advise Maryland Casualty
24   Company that Ms. Mary Roe wanted to break her lease?
25        A.  No.
```

1      Q.   Did you ever advise Maryland Casualty

2    Company that Mr. Storch was in prison?

3      A.   No.

4      Q.   Do you have any knowledge or recollection

5    of any notice of the Jane Doe lawsuit being provided

6    on your behalf to Maryland Casualty Company?

7      A.   Yes.

8      Q.   When was that?

9      A.   After.   I didn't know the name of the

10   insurance company.   I didn't even know anything about

11   it.

12     Q.   So it's your testimony that the first time

13   that you can recall that Maryland Casualty Company

14   would have received notice of the Jane Doe lawsuit

15   would have been May of 2013?

16     A.   I would assume around that time, yes.

17          MR. CRAIG:   To her knowledge.

18   BY MR. MEEKS:

19     Q.   Prior to that you don't have any knowledge

20   of anybody providing any notice on your behalf to

21   Maryland Casualty Company?

22     A.   No.

23     Q.   What about Salon Avenue Suites, do you have

24   any knowledge that anybody provided notice of

25   Mr. Storch's arrest on behalf of Salon Avenue Suites

```
 1    to Maryland Casualty Company?

 2         A.   I don't know.

 3         Q.   Do you have any knowledge that anybody

 4    provided notice to Maryland Casualty Company of any

 5    lawsuits involving the discovery of cameras?

 6         A.   No.

 7         Q.   Ms. Colon, did you ever receive any written

 8    demands from anybody that you pay money or damages

 9    because of what happened with the discovery of

10    cameras at the salon locations?

11         A.   I think I recall something like that.

12         Q.   When do you --

13              (Off-the-record discussion between the

14    witness and Mr. Craig).

15         A.   I don't remember when.

16    BY MR. MEEKS:

17         Q.   So you don't remember when --

18         A.   No.

19         Q.   Do you recall the names of anybody that

20    would have made those?

21         A.   No.   I was under a lot of duress working 70

22    hours a week in my job and running two places.

23         Q.   Do you recall if you would have received

24    those letters before you received service of the

25    lawsuit?
```

1        A.   I don't recall.

2        Q.   Do you have any copies of those demands in

3   your possession?

4        A.   No.

5        Q.   Did you provide them to an attorney?

6        A.   I did not personally, no.

7        Q.   Did you ever have any verbal confrontations

8   with any of the tenants about anything that occurred

9   with regard to the cameras?

10        A.   What do you mean?

11        Q.   Anybody saying they were going to sue you,

12   saying that they're going to call the police or

13   anything like that?

14        A.   No, on the contrary.  They wanted to work

15   for me.  They wanted to help run the business.  They

16   were very happy.  They said there was no issue.

17        Q.   You said, as we referred to earlier, the

18   new team member didn't last very long.  Was she

19   replaced with somebody else at some point?

20        A.   Months later, in August or September.

21        Q.   August or September of which year?

22        A.   Well, maybe it wasn't that many months.

23   September 2012 or October.

24        Q.   Is that person still --

25        A.   No.

1          Q.   Did Mr. Storch ever come back to run the

2    salon locations?

3          A.   No.

4          Q.   Are the salon locations still operating?

5          A.   Yes.

6          Q.   Do you have any involvement in their

7    operation currently?

8          A.   Yes.

9          Q.   In what capacity?

10         A.   I oversee the management of both.

11         Q.   So you do that in addition to your job that

12    you spoke of at the beginning of the deposition?

13         A.   Yes.

14         Q.   This demand letter that we were speaking

15    about earlier, do you recall what happened to it?

16         A.   No.

17         Q.   Did you ever provide that letter to

18    Maryland Casualty Company?

19         A.   No.

20         Q.   Did you give it to Mr. Storch?

21         A.   No.

22              MR. MEEKS:  Let's go off the record for a

23    couple of minutes and take a short break.

24              (Recess 10:56 a.m. - 11:04 a.m.)

25              MR. CRAIG:  So that we're all clear, and

1    that is my client has been asserting privilege, we

2    are asserting both the marital confidence privilege

3    as well as the spousal witness privilege under OCGA

4    24-5-501 and 503.  Thank you.

5    BY MR. MEEKS:

6        Q.  Ms. Colon, I just have a couple more

7    follow-up questions for you.

8            I want to go back to the demand letter that

9    we were talking about earlier.  And I'm going to ask

10   you, do you recall where you received it?  Did you

11   receive it at your house?

12       A.  I don't know.

13       Q.  Did you receive it from one of the salon

14   locations?

15       A.  I don't think so.

16       Q.  Did you check the mail at the salon

17   locations?

18       A.  Sometimes.

19       Q.  Do you have any idea how often, if you can

20   recall?

21       A.  I only went about once a week.

22       Q.  And that was after Mr. Storch was arrested?

23       A.  Yes.

24       Q.  You don't have any recollection of the

25   address block or anything like that for the letter?

```
 1        A.   What's an address block?

 2        Q.   The address at the top.

 3        A.   No.  I was under a lot of duress.  I don't

 4   recall.

 5        Q.   You don't recall who it was from?

 6        A.   No.

 7        Q.   No return address?

 8        A.   We were getting a lot of attorney letters,

 9   trying to get his business.

10        Q.   Did you read any of those letters?

11        A.   No.

12        Q.   Did you provide them to Mr. Storch?

13        A.   I put the mail aside.

14             MR. CRAIG:  Are you talking about while he

15   was in prison?

16             MR. MEEKS:  Yes, I suppose.  Fair enough.

17   BY MR. MEEKS:

18        Q.   So you did receive letters from attorneys

19   addressed to Mr. Storch while he was in prison,

20   correct?

21        A.   I guess, yeah.

22        Q.   Do you recall what this demand letter was

23   asking for?

24             (Off-the-record discussion between the

25   witness and Mr. Craig).
```

1      A.   I think they wanted $500,000.

2      Q.   Did they put a deadline on when it would be

3  provided?

4      A.   Honestly, that's the only thing I remember,

5  because it was kind of an absurd number.

6      Q.   Was there anything attached to the letter

7  like a settlement agreement or anything --

8      A.   Not that I recall.

9      Q.   Did the letter disclose if it was sent on

10  behalf of anybody other than the person that sent it?

11      A.   Yes.

12      Q.   And do you recall who that person was?

13      A.   I think it was Mary Roe.

14      Q.   And was she currently a tenant at the time

15  that you received the letter?

16      A.   No.   She had been gone from the beginning.

17      Q.   And by the beginning, you mean in July?

18      A.   July.

19      Q.   Do you recall how much longer after she

20  left that you received the letter?

21      A.   No.

22      Q.   Was it weeks?

23          MR. CRAIG:   I object.   She's already said

24  she doesn't remember.

25  BY MR. MEEKS:

1        Q.   Do you recall if it was before or after Mr.

2   Storch was in prison?

3            MR. CRAIG:   Same objection.   She says she

4   doesn't remember.

5            MR. MEEKS:   I think that's all we have at

6   the moment.

7            MR. CRAIG:   Thank you very much.

8            (Signature reserved.)

9            (Deposition concluded at 11:15 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       CERTIFICATE

 2    STATE OF GEORGIA:

 3    COUNTY OF FULTON:

 4          I hereby certify that the foregoing

 5    transcript was taken down, as stated in the caption,

 6    and the colloquies, questions and answers were

 7    reduced to typewriting under my direction; that the

 8    transcript is a true and correct record of the

 9    evidence given upon said proceeding.

10          I further certify that I am not a relative

11    or employee or attorney of any party, nor am I

12    financially interested in the outcome of this action.

13          This the 5th day of June 2014.

14

15

16

17

18

19          Lucy C. Rateau, RPR, CCR 2766

20

21

22

23

24

25
```

```
 1    TO: Daniel Kingsley

 2    Re: Signature of Deponent 30(b)(6) & Indv Juliette Colon

 3    Date Errata due back at our offices:  07/05/2014

 4

 5    Greetings:

 6    The deponent has reserved the right to read and sign.
      Please have the deponent review the attached PDF

 7    transcript, noting any changes or corrections on the
      attached PDF Errata.  The deponent may fill out the

 8    Errata electronically or print and fill out manually.

 9
      Once the Errata is signed by the deponent and notarized,

10    please mail it to the offices of Tiffany Alley (below).

11
      When the signed Errata is returned to us, we will seal

12    and forward to the taking attorney to file with the
      original transcript.  We will also send copies of the

13    Errata to all ordering parties.

14
      If the signed Errata is not returned within the time

15    above, the original transcript may be filed with the
      court without the signature of the deponent.

16

17

18    Please send completed Errata to:

19    Tiffany Alley Global Reporting & Video

20    730 Peachtree St. NE, Ste 470

21    Atlanta, GA 30308

22    (770) 343-9696

23

24

25
```

```
 1   ERRATA
 2   I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
 3
 4   ___  There are no changes noted.
 5   ___  The following changes are noted:
 6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
 7   Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
 8   be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
 9   such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____  Line _____  Change _____
12   _____
13   Reason for change _____
14   Page _____  Line _____  Change _____
15   _____
16   Reason for change _____
17   Page _____  Line _____  Change _____
18   _____
19   Reason for change _____
20   Page _____  Line _____  Change _____
21   _____
22   Reason for change _____
23   Page _____  Line _____  Change _____
24   _____
25   Reason for change _____
```

```
1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Reason for change _____

7    Page _____ Line _____ Change _____

8    _____

9    Reason for change _____

10   Page _____ Line _____ Change _____

11   _____

12   Reason for change _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19

20        _____

              DEPONENT'S SIGNATURE

21

     Sworn to and subscribed before me this ___ day of

22   _____, _____.

23

     _____

24   NOTARY PUBLIC

25   My Commission Expires:_____
```

```
 1
 2                         D I S C L O S U R E
 3
 4
 5      Pursuant to Article 10(b) of the Rules and Regulations
 6      of the Georgia Board of Court Reporting, Tiffany Alley
 7      Global Reporting & Video makes the following disclosure:
 8
 9      The reporter for this proceeding is not disqualified
10      for a relationship of interest under the provisions of
11      OCGA 9-11-28(c).  The reporter for this proceeding is
12      a Georgia Certified Reporter, here as a representative
13      of Tiffany Alley Global Reporting & Video to report
14      this matter.
15
16      Tiffany Alley Global Reporting & Video is not taking this
17      deposition under any contract that is prohibited by
18      OCGA 15-14-37(a)and(b).
19
20
21
22
23
24
25
```