IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARYLAND CASUALTY           :
COMPANY,                    :
                            :
            Plaintiff,      :
                            :
v.                          :      CIVIL ACTION FILE
                            :      NO. 1:13-cv-3056-TWT
SALON AVENUE SUITE 2, ET AL.,:
                            :
            Defendants.     :

**PLAINTIFF MARYLAND CASUALTY COMPANY'S
STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED**

COMES NOW Plaintiff Maryland Casualty Company ("MCC") and,

pursuant to Local Rule 56.1, hereby submits its Statement of Material Facts As to

Which There is No Issue to be Tried, showing the court as follows:

1.  Between May 2004 and December 2008, Defendant Mark Storch ("Storch")

    was in prison for felony charges of assault with attempt to rape and cocaine

    possession. (Deposition of Mark Storch ("Storch Dep.") at pp 13-15,

    excerpts attached as Ex. 1;[1] Deposition of Juliette Colon (Colon Dep.) at pp.

---

[1] To the extent Storch pled the Fifth Amendment in response to certain questions in
his deposition, MCC is entitled to an adverse inference against Storch on the issues
covered by those questions. *See Eagle Hosp. Physicians, LLC v. SRG Consulting,*

12-14, excerpts attached as Ex. 2.)[2]

2.      Storch registered as a sex offender following his release from prison. (*Id.*)

3.      After his release from prison, Storch began serving a 10-year probation term. (*Id.*)

4.      Storch and Colon began dating before Storch went to prison. (Ex. 1, Storch Dep. at pp. 15, 56-59; Ex. 2, Colon Dep. at pp. 12-14.)

5.      Colon was aware of Storch's criminal history at the time they met. (*Id.*)

6.      Storch and Colon's relationship continued while Storch was in prison. (*Id.*)

7.      Colon and Storch married on March 6, 2009. (*Id.*)

8.      In late-2009, Storch and Colon began developing a "salon suite concept business" wherein they would lease private suite space to various beauty professionals to conduct their businesses. (Ex. 1, Storch Dep. at pp. 15-17; Ex. 2, Colon Dep. at pp. 14-15.)

9.      Storch and Colon were the only officers and owners of Defendants Salon Avenue Suite 2 and Salon Avenue Suites, Inc. (collectively, "Salon"). (Ex. 1, Storch Dep. at pp. 17-18; Ex. 2, Colon Dep. at p. 16; Doc. 1 ¶ 3; Doc. 14 ¶ 3.)

---

*Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("court may draw adverse inferences against a party that invokes the Fifth Amendment.").

[2] Exhibits 1-16 referenced herein are attached to MCC's Appendix of Exhibits filed in support of its Motion for Summary Judgment.

10. The services performed by several of the beauty professionals who rented suites required their customers to either be nude or partially nude. (Ex. 3 ¶¶ 13, 21, Complaint for Personal Injuries, *Roe v. Storch*, No. 2013-A-1177-1 (State Ct. Cobb County Apr. 11, 2013); Ex. 4 ¶¶ 15, 21, 23, Complaint, *Doe v. Storch*, No. 2013-A-356-1 (State Ct. Cobb County Feb. 1, 2013); Ex. 5 ¶ 16, Complaint, *Bowen v. Storch*, No. 2013-A-2014-5 (State Ct. Cobb County July 8, 2013).)

11. The first Salon location was located at 2550 Sandy Plains Road in Marietta and opened in March of 2010 (the "Sandy Plains Location") (Ex. 1, Storch Dep. at pp. 22-23.)

12. A second location was later opened at 3120 Loring Road in Acworth (the "Loring Road Location") (*Id.* at pp. 16, 22-23.)

13. Storch managed the daily operations of both locations. (*Id.* at pp. 17-19.)

14. At some point, Storch installed hidden cameras at each Salon location above certain suites and in at least one bathroom (the "Hidden Cameras"). (*Id.* at pp. 23-24, 29-31, 42-43; Ex. 3 ¶¶ 10-11, 14-18, 20; Ex. 4 ¶¶ 24, 35; Ex. 5 ¶¶ 15-17; Ex. 6 ¶¶ 15-17, Complaint, *McRae v. Storch*, No. 2013-A-1889-7 (State Ct. Cobb County June 21, 2013); Ex. 7 ¶¶ 15-17, Complaint, *Barron v. Storch*, No. 2013-A-1913-4 (State Ct. Cobb County June 24, 2013); Ex. 8

¶¶ 15-17, Complaint, *Miller v. Storch*, No. 2013-A-1932-1 (State Ct. Cobb County June 27, 2013); Ex. 9 ¶¶ 15-17, Complaint, *Benedict v. Storch*, No. 2013-A-1930-1 (State Ct. Cobb County June 27, 2013); Ex. 10 ¶¶ 16-18, Complaint, *Clark v. Storch*, No. 2013-A-2103-5 (State Ct. Cobb County July 16, 2013).)

15.   Storch did not have permission from the tenants or their customers to install the Hidden Cameras. (Ex. 1, Storch Dep. at pp. 28-31, 38, 43; Ex. 3 ¶¶ 14-18, 20-22; Ex. 4 ¶¶ 25-27, 38; Ex. 5 ¶¶ 15-17; Ex. 6 ¶¶ 15-17; Ex. 7 ¶¶ 15-17; Ex. 8 ¶¶ 15-17; Ex. 9 ¶¶ 15-17; Ex. 10 ¶¶ 16-18.)

16.   The Hidden Cameras were not monitored by any security service. (Ex. 1, Storch Dep. at p. 25; Ex. 3 ¶ 18)

17.   The Hidden Cameras were connected to a recording device that Storch could access. (Ex. 1, Storch Dep. at pp. 25, 43-44; Ex. 3 ¶¶ 16-18; Ex. 4 ¶¶ 33-35; Ex. 5 ¶¶ 17-18; Ex. 6 ¶¶ 16-18; Ex. 7 ¶¶ 16-18; Ex. 8 ¶¶ 16-18; Ex. 9 ¶¶ 16-18; Ex. 10 ¶¶ 17-18.)

18.   The Elizabeth B. Barron, Kari Benedict, Heather Bowen, Nancy Clark, Donna McRae, Katherine Miller, Mary Roe And Jane Doe (collectively, the "Underlying Plaintiffs") allege that:

For many months prior to July 27, 2012, Storch would frequently approach female subtenants of TOPZ at both locations, Sandy Plains

Road and Logan Road, (including Plaintiff) and quote to them remarks and statements they had made only minutes earlier, many yards away from his presence. It troubled them to realize that he was hearing things they were saying in private to each other, however innocuous the remarks may have been. When they asked him how he knew what they had been saying, he would routinely answer, "I know everything you are saying all the time." He plainly enjoyed letting them know this.

(Ex. 3 ¶ 12.)

Defendant Storch was aware of, placed, and/or otherwise directed the placement of the recording device on the Property in the location(s) wherein recorded visual images could be taken of persons in the business(es) and where persons would be in various stages of undress and/or partial nudity.

(Ex. 4 ¶ 35.)

 . . . Defendant Storch had surreptitiously installed a video surveillance camera in the ladies restroom on the premises of Salon Avenue Suites so that he could obtain live images and video footage of women in various stages of undress and actively engaging in their most private moments.

(Ex. 5 ¶ 15; *id.* at ¶¶ 16-18; Ex. 6 ¶ 15; Ex. 7 ¶ 15; Ex. 8 ¶ 15; Ex. 9 ¶ 15; Ex. 10 ¶ 16.)

19.   On July 27, 2012, Defendants Jane Doe and Mary Roe allege that they discovered a hidden camera at the Sandy Plains Location while Roe was waxing Doe's genitals.[3] (Ex. 1, Storch Dep. at p. 33; Ex. 3 ¶¶ 13-15; Ex. 4 ¶¶

---

[3] As noted in MCC's Complaint, Jane Doe and Mary Roe are pseudonyms. Consistent with the orders of the Cobb County State Court regarding their right to

21-28.)

20.   Such procedures were a part of Roe's business and frequently required that

customers be nude from the waist down. (Ex. 3 ¶¶ 13-14; Ex. 4 ¶¶ 21-24.)

21.   To facilitate the procedure, Roe conducted her business in private with the

door to her suite closed. (*Id.*)

22.   Following discovery of the hidden camera, Roe alleges that she called 911.

(Ex. 3 ¶ 15; Ex. 4 ¶ 29.)

23.   While waiting for the police, Roe alleges that Storch arrived at the Sandy

Plains Location and confronted her concerning the hidden camera. (Ex. 1,

Storch Dep. at p. 34; Ex. 3 ¶ 16.)

24.   Roe alleges that Storch asked her to take him to see the camera but that she

refused and told him that the police were on the way. (Ex. 1, Storch Dep. at

p. 39; Ex. 11 ¶ 56, Amendment to Complaint, *Roe v. Storch*, No. 2013-A-

1177-1 (State Ct. Cobb County May 1, 2014).)

25.   Roe alleges that Storch then went to a utility closet and removed a laptop

computer to his vehicle. (Ex. 3 ¶ 16; Ex. 4 ¶¶ 33-34; Ex. 11 ¶ 57.)

26.   Thereafter, the police arrived, questioned Storch, and impounded his vehicle.

(Ex. 1, Storch Dep. at pp. 39-40; Ex. 2, Colon Dep. at pp. 22-23, 26; Ex. 3

proceed anonymously, MCC has referred to these Underlying Plaintiffs as Jane
Doe and Mary Roe in this lawsuit.

¶¶ 17-19.)

27.    On July 27, 2012, the police executed a search warrant on Storch and Colon's home and took essentially all computerized devices. (Ex. 2, Colon Dep. at p. 27.)

28.    Colon was informed of the discovery of the Hidden Cameras on July, 27, 2012. (*Id.* at pp. 22-23, 26, 34-35.)

29.    On July 29, 2012, Colon sent correspondence to the tenants at both Salon locations "apologiz[ing] for any inconvenience, confusion or frustration based on Friday's [July 27] events." (*Id.* at pp. 32-33; Ex. 12, July 29, 2012 Corr.)

30.    Subsequently, Colon spoke with each tenant and let them know that they could leave. (Ex. 2, Colon Dep. at pp. 23-24.)

31.    All but five tenants left immediately. (*Id.* at p. 24.)

32.    Roe left her suite almost immediately after July 27, 2012. (Ex. 3 ¶ 19.)

33.    Shortly thereafter, Colon attempted to obtain a liability release from Roe in favor of Salon, Storch, and Colon. (Ex. 2, Colon Dep. at pp. 36-37; Ex. 3 ¶ 19.)

34.    Roe, through counsel, refused to sign the release. (Ex. 3 ¶ 19.)

35.    Roe's attorney also made a demand for $500,000 for Roe's claims relating to

the Hidden Cameras. (Ex. 2, Colon Dep. at pp. 41-47.)

36.   Colon ignored the $500,000 demand from Roe's attorney. (*Id.*)

37.   On August 10, 2012, Storch was arrested for unlawful surveillance under O.C.G.A. § 16-11-62 based on the Hidden Cameras. (Ex. 1, Storch Dep. at pp. 44, 62; Ex. 2, Colon Dep. at pp. 22-25, 30, 34-35.)

38.   Following his arrest, the police conducted a search on the Loring Road Location and took a computer, which allegedly contained images of nude women in the restroom and in at least one suite. (Ex. 1, Storch Dep. at pp. 42-43, 64-65; Ex. 2, Colon Dep. at pp. 28-29; Ex. 3 ¶ 20; Ex. 5 ¶ 20; Ex. 6 ¶ 20; Ex. 7 ¶ 20; Ex. 8 ¶ 20; Ex. 9 ¶ 20; Ex. 10 ¶ 21.)

39.   On October 11, 2012, Storch agreed to a revocation of his probation for committing the offense of "Eavesdropping-Surveillance(F)" on July 12-14, and 27, 2012. (Ex. 1, Storch Dep. at pp. 61-63; Ex. 3 ¶¶ 23-24; Ex. 4 ¶¶ 8-9.)

40.   Between February 1, 2013 and July 16, 2013, the Underlying Plaintiffs filed suit against Salon, Storch, Colon, and others relating to the presence of the Hidden Cameras at the Salon locations (collectively, the "Underlying Lawsuits"). (Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9; Ex. 10.)

41.   The Underlying Plaintiffs allege that they were victims of Eavesdropping-Surveillance:

Plaintiff was a victim of Eavesdropping-Surveillance by Defendant Storch first, for several months in 2012 prior to July 27, 2012, in the restroom facility at the Logan Road location, second for a few months in 2012 prior to July 27, 2012, as a customer or person undergoing a "Brazilian Wax" at the Sandy Plains Road location, and third, as the manager and operator of a small salon whose client and customer was so victimized, causing Plaintiff in turn to suffer public embarrassment and loss of clientele when the media began broadcasting the description of the events and where they occurred, starting the very day of July 27, 2012.

(Ex. 3 ¶ 25.)

Plaintiff was at least one of the victims of defendant Storch's "Eavesdropping-Surveillance."

(Ex. 4 ¶ 10.)

Ms. McRae [and Ms. Miller, Ms. Benedict, Ms. Clark, Ms. Barron, and Ms. Bowen] was one of the numerous women whose nude images and video footage were obtained, cultivated and stored on computer equipment and hard drives by Defendant Storch.

(Ex. 6 ¶ 18; Ex. 7 ¶ 18; Ex. 8 ¶ 18; Ex. 9 ¶ 18; Ex. 10 ¶ 19; *see* Ex. 5 ¶ 21.)

42. The Underlying Lawsuits make no allegations that the Underlying Plaintiffs were physically harmed or injured by Salon, Storch, or Colon. (Ex. 3 ¶¶ 32-48; Ex. 4 ¶¶ 51-70; Ex. 5 ¶¶ 21, 34-89; Ex. 6 ¶ 18, 34-88; Ex. 7 ¶ 18, 34-88; Ex. 8 ¶¶ 18, 34-88; Ex. 9 ¶¶ 18, 34-88; Ex. 10 ¶¶ 19, 35-91.)

43. The Underling Lawsuits allege that the Underlying Plaintiffs' claims are the result of Storch's intentional, criminal conduct of placing the Hidden Cameras above the restrooms and certain suites without permission from any

tenant or tenant's customer in order to obtain images of nude women. (Ex. 3 ¶¶ 24-25, 32-48; Ex. 4 ¶¶ 8-10, 51-70; Ex. 5 ¶¶ 15-19, 34-89; Ex. 6 ¶¶ 15-19, 34-88; Ex. 7 ¶¶ 15-19, 34-88; Ex. 8 ¶¶ 15-19, 34-88; Ex. 9 ¶¶ 15-19, 34-88, Ex. 10 ¶¶ 16-20, 35-91.)

44. The Underlying Lawsuits allege that Storch knowingly and willfully violated O.C.G.A. § 16-11-62, Georgia's unlawful surveillance statute. (*Id.*)

45. Each Underlying Lawsuit asserts claims for, *inter alia*, invasion of privacy and intentional infliction of emotional distress as well as negligence claims based on vicarious liability and/or negligent hiring or retention. (Ex. 3 ¶¶ 32-48; Ex. 4 ¶¶ 51-70; Ex. 5 ¶¶ 34-89; Ex. 6 ¶¶ 34-88; Ex. 7 ¶¶ 34-88; Ex. 8 ¶¶ 34-88; Ex. 9 ¶¶ 34-88; Ex. 10 ¶¶ 35-91.)

46. On July 25, 2013, Storch was indicted in Cobb County on 25 felony counts of unlawful surveillance under O.C.G.A. § 16-11-62, relating to the Hidden Cameras. (Ex. 1, Storch Dep. at pp. 59-60; Ex. 13, Indictment, *State v. Storch*, No. 132834 (Superior Ct. Cobb County July 25, 2013).)

47. The criminal prosecution against Storch is pending. (Ex. 1, Storch Dep. at pp. 59-60.)

48. The first time MCC became aware of any allegations that Storch used hidden cameras in Salon's bathrooms and suites to film women as they used

the bathroom or were in various states of undress was on March 11, 2013. On March 11, 2013, MCC received a copy of the lawsuit filed by Jane Doe, via e-mail by Melissa Price at the Dickerson Agency, Inc. Ms. Price's e-mail attached a copy of the Complaint, Summons, Motion to Proceed Anonymously, and Order on Motion to Proceed Anonymously filed in Jane Doe's lawsuit as well as an Acord General Liability Notice of Occurrence/Claim form. MCC acknowledged receipt of the claim on March 13, 2013. (Ex. 14, Affidavit of Matthew Combest (Combest Aff.) ¶ 8.)

49. Prior to March 11, 2013, no one informed MCC that:

- On July 27, 2012, the Underlying Plaintiffs identified as Jane Doe and Mary Roe allege that they discovered a hidden camera above Mary Roe's suite at the Salon location on Sandy Plains Road (the "Hidden Camera");

- As a result of the discovery of the Hidden Camera, the police were called to the Sandy Plains location on July 27, 2012, questioned Storch, and impounded his vehicle;

- In connection with the police's investigation of the discovery of the Hidden Camera, Storch and Colon's home was searched on July 27, 2012, resulting in the seizure of several electronic devices;

- All but five of Salon's tenants left after learning about the discovery of the Hidden Camera;

- On August 10, 2012, Storch was arrested on invasion of privacy charges relating to the discovery of the Hidden Camera;

- Following Storch's arrest, on August 10, 2012, the police searched the Salon location on Loring Road in connection with the investigation relating to the discovery of the Hidden Camera;

- Effective October 11, 2012, Storch's probation was revoked for committing offenses of "Eavesdropping-Surveillance (F)" on July 12-14 and 27, 2012 related to the presence of hidden cameras at both Salon locations;

- Shortly after the discovery of the Hidden Camera, Colon attempted to obtain a release of liability from Mary Roe for claims related to the Hidden Camera but was refused by Mary Roe's attorney; and

- Shortly after the discovery of the Hidden Camera, Colon was aware that Mary Roe had retained an attorney related to the discovery of the Hidden Camera.

- Colon received a $500,000 demand from Mary Roe's attorney relating to the Hidden Camera, which Colon put in the trash.

(*Id.* at ¶¶ 7, 9.)

50.   Prior to March 11, 2013, no one informed MCC about any claims or allegations that Storch used hidden cameras in Salon's bathrooms and suites to film the Underlying Plaintiffs as they used the bathroom or were in various states of undress. (*Id.* at ¶ 10.)

51.   MCC issued policy number PAS 04518405 for the policy period 11/15/10-11/15/11 and renewed for 11/15/11-11/15/12 (the "Policies"). (Policy No. PAS04518405 (Nov. 15, 2010), excerpts attached as Ex. 15; Policy No. PAS04518405 (Nov. 15, 2011), excerpts attached as Ex. 16.)

52.   The Policies identify the named insured as "Salon Avenue Suite 2" and lists the Loring Road location as the mailing address. (Ex. 15 at Doc. 1-1 p. 3; Ex. 16 at Doc. 1-3 p. 3.)

53.   The Policies define an insured, in pertinent part, as follows:

**SECTION II – WHO IS AN INSURED**

1.  If you are designated in the Declarations as:

* * * *

d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

* * * *

(Ex. 15 at Doc. 1-2 p. 22; Ex. 16 at Doc. 1-4 p. 22.)

54.   The Policies contain the following relevant conditions:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

* * * *

2.  **Duties In The Even Of Occurrence, Offense, Claim Or Suit**

a.  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or "offense" took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.  If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.  You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

* * * *

(Ex. 15 at Doc. 1-2 p. 25; Ex. 16 at Doc. 1-4 p. 25.)

55.   The Policies contain the following relevant definitions:

3.  "Bodily injury" means bodily injury, sickness or disease sustained by a person.  This includes mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness or disease.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- 14 -

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

   e. Publication, in any manner, of material that violates a person's right of privacy.[4]

   f. Misappropriation of advertising ideas or style of doing business; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

(Ex. 15 at Doc. 1-2 pp. 27-29; Ex. 16 at Doc. 1-4 pp. 27-29.)

56.   Coverage A of the Policies' Commercial General Liability Coverage Form

states, in pertinent part, as follows:

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

---

[4] Definitions 14(e) & (f) as modified by the Electronic Data Liability Amendment Endorsement. (Ex. 15 at Doc. 1-2 p. 32; Ex. 16 at Doc. 1-4 p. 32.)

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit that may result. But:

    * * * *

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"

        * * * *

2.  **Exclusions**

    This insurance does not apply to:

    a.  **Expected Or Intended Injury**

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

        * * * *

    o.  **Professional**

- 16 -

(1) "Bodily injury" or "property damage" arising out of the rendering of failing to render any professional service, including but not limited to:

    (a) Accounting, advertising, architectural, drafting, engineering, financial, insurance or legal services, advice and instruction;

    (b) Medical, cosmetic, dental, ear piercing, hair dressing, massage, physical therapy, veterinary, nursing, surgical or x-ray services, advice and instruction;

    (c) Use of any tanning booth, tanning bed, tanning equipment or tanning device;

    (d) Laboratory operations or services, whether medical or not; and

    (e) Services performed as a funeral director or as an operator of a cemetery; and

    (f) Any service treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming.

* * * *

p. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

* * * *

(Ex. 15 at Doc. 1-2 pp. 15-20; Ex. 16 at Doc. 1-4 pp. 15-20.)

57.   Coverage B of the Policies' Commercial General Liability Coverage Form

states, in pertinent part, as follows:

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.  But:

   * * * *

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business by only if the offense was committed by the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. "Personal and advertising injury":

      (1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

      * * * *

      (4) Arising out of the willful violation of a penal statute or ordinance committed by or at with the consent of any

insured;

* * * *

(Ex. 15 at Doc. 1-2 p. 20; Ex. 16 at Doc. 1-4 p. 20.)

58.   The Policies Barbers and Beauticians Professional Liability Endorsement

states, in pertinent part, as follows:

A. The following is added to **SECTION I – COVERAGES:**

**BARBERS AND BEAUTICIANS PROFESSIONAL LIABILITY**

1. **Insuring Agreement**

We will pay those sums that the insured becomes legally
obligated to pay as damages because of any claim made against
the insured to which this insurance applies. No other obligation
or liability to pay sums or perform acts or services applies
unless explicitly provided for under **SUPPLEMENTARY
PAYMENTS – COVERAGE A AND B**. This insurance
applies only to claim made against the insured for damages
caused by a negligent act, error or omission of the insured or of
any person for whose acts, errors or omissions the insured is
legally responsible in providing or failing to provide "barbers
and beauticians services" in the "coverage territory" during the
Policy Period.  We will have the right and duty to defend any
"suit" seeking those damages. But:

* * * *

d.   We will have no duty to defend the insured against any
"suit" seeking damages to which this insurance does not
apply.

2. **Exclusions**

This coverage does not apply to:

\* \* \* \*

d. (1) "Bodily injury" or "property damage" for which coverage is provided under the Commercial General Liability Coverage Part contained in this policy, or which would have been provided except for the exhaustion of the Limits of insurance; or

(2) "Personal and advertising injury liability".

f. Damages expected, caused intentionally by or at the direction of the insured, or that should have been reasonably foreseen by the insured.

\* \* \* \*

E. The following is added to **SECTION V – DEFINITIONS**:

1. "Barbers and Beauticians Services" means those activities customary in a beauty shop or barber shop including:

a. Hair weaving, hair straightening, hair cutting, styling, trimming, singeing, conditioning, dressing, shampooing, tinting, bleaching, dyeing or coloring;

b. Eyebrow arching, tweezing or plucking;

c. The removal of unwanted hair by shaving for the use of wax or depilatory preparation;

d. Hair or scalp treatments;

e. Face or neck massaging;

f. Manicuring or pedicuring; or

    g.  Marcel, finger or water waving.

    h.  Service by the insured as a member or director of a formal accreditation, standards review or similar professional board or committee.

(Ex. 15 at Doc. 1-2 pp. 38-42; Ex. 16 at Doc. 1-4 pp. 38-42.)

59.    The Policies provide that the words "you" and "your" refer to the Named Insured shown in the Declarations. (Ex. 15 at Doc. 1-2 p. 15; Ex. 16 at Doc. 1-4 p. 15.)

Respectfully submitted this 7th day of July, 2014.

|  |  |
|---|---|
| | /s/Christopher C. Meeks |
| Weissman, Nowack, Curry & Wilco, PC | Seth M. Friedman |
| One Alliance Center, 4th Floor | Georgia Bar No. 141501 |
| 3500 Lenox Road | Christopher C. Meeks |
| Atlanta, Georgia 30326 | Georgia Bar No. 371020 |
| (404) 926-4500 | *Attorneys for Plaintiff* |
| (404) 926-4600 (Fax) | |
| sethfriedman@wncwlaw.com | |
| christophermeeks@wncwlaw.com | |

IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARYLAND CASUALTY          :
COMPANY,                   :
                           :
            Plaintiff,     :
                           :
v.                         :          CIVIL ACTION FILE
                           :          NO. 1:13-cv-3056-TWT
SALON AVENUE SUITE 2, ET AL., :
                           :
            Defendants.    :

## CERTIFICATE OF COMPLIANCE

Counsel certifies that this filing is prepared with Times New Roman 14-point font in compliance with Local Rule 5.1.

This 7th day of July, 2014.

                         /s/Christopher C. Meeks
                         Christopher C. Meeks
                         Georgia Bar Number 371020

WEISSMAN, NOWACK,
CURRY & WILCO, P.C.
One Alliance Center
3500 Lenox Road, 4th Floor
Atlanta, Georgia 30326
(404) 926-4500
Fax (404) 926-4600

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2014, I electronically filed the foregoing

**PLAINTIFF MARYLAND CASUALTY COMPANY'S STATEMENT OF**

**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO**

**BE TRIED** with the Court using the CM/ECF system which will automatically

send E-mail notification of such filing to the following attorney of record:

| | |
|---|---|
| J. Blair Craig, II, Esq. | E. Brian Watkins, Esq. |
| blair@woodcraig.com | brian@ebrianwatkinslaw.com |
| | |
| Richard G. Farnsworth, Esq. | Albert Maitland Yates, III, Esq. |
| RGF56@hotmail.com | tmy@kaufmanlaw.net |

/s/Christopher C. Meeks

WEISSMAN, NOWACK,
CURRY & WILCO, P.C.
One Alliance Center
3500 Lenox Road, 4th Floor
Atlanta, Georgia 30326
(404) 926-4500
(404) 926-4600 (Fax)
christophermeeks@wncwlaw.com

Christopher C. Meeks
Georgia Bar Number 371020
*Attorney for Plaintiff*